UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

BRAD HOUGHAM,

                       Plaintiff,        **Case #:**  3:25-cv-529 (AJB/MJK)

    vs.

                                   **COMPLAINT**

TRUSTEES OF ITHACA COLLEGE,

                     Defendant.      **Jury Trial Demanded**

---

Plaintiff Brad Hougham ("plaintiff") by and through his attorneys, Pheterson Spatorico LLP, for his complaint against defendant Trustees of Ithaca College ("defendant"), states as follows.

NATURE OF THE ACTION

1. Plaintiff commences this action against defendant contending that it violated the provisions of Title IX of the Education Amendments of 1972 ("Title IX"). Specifically, plaintiff maintains that defendant: **a)** permitted a pervasively hostile sexual environment to exist on campus which limited plaintiff's educational and professional opportunities at defendant's institution; **b)** exhibited deliberate indifference to his timely and detailed complaints of numerous instances of sexual harassment by faculty and staff; and **c)** retaliated against him for making complaints to proper college authorities in conformity with extant policies then in place to address sexual harassment suffered by faculty members.

2. By virtue of defendant's alleged wrongful conduct and omissions, plaintiff asserts he suffered injuries proximately related thereto for which he now seeks compensatory and punitive damages, attorney's fees and other relief.

1

JURISDICTION & VENUE

**3.** Pursuant to 28 USC §1331 this Court has subject matter jurisdiction over the claims made in the complaint as they arise under statutes of the United States of America (viz. Title IX of the Educational Amendments of 1972, 20 USC §§1681 et seq.)

**4.** Pursuant to 28 USC §1391 venue properly lies with this Court as defendant's institution is located in the Northern District and all of the relevant actions and omissions complained of occurred therein.

**5.** This Court has *in personam* jurisdiction over defendant as its main campus is situate in the Town of Ithaca, Tompkins County, New York, where it engages in the purposeful activity of educating undergraduate and graduate students.

PARTIES

**6.** At all times relevant hereto **plaintiff Brad Hougham, DMA** was and still is a tenured professor of music performance in defendant's School of Music, Theatre and Dance.

**7.** In April 2019 plaintiff was appointed associate provost for faculty affairs by then provost and vice president of academic affairs, La Jerne Terry Cornish. Plaintiff served in this administrative role for a three-year period beginning July 1, 2019 and ending June 30, 2022.

**8**. During his term as associate provost plaintiff oversaw important projects for provost Cornish including: collaboration with other offices/committees to oversee faculty recruitment, development and retention processes; successful updating of the faculty handbook; and his

work as co-chair of the Academic Program Prioritization Implementation Committee ("APPIC"), resulting in a "Shape of the College" document which was presented to then President Collado and the Board of Trustees. Plaintiff received high praise from provost Cornish, president Collado and the Board of Trustees for the scope and quality of the work accomplished on behalf of defendant.

**9.** Prior to plaintiff's appointment to associate provost he served for four years as chairperson of the All-College Tenure and Promotion Committee, three years on the Faculty Development Committee and three terms on the Academic Policies Committee, in addition to serving on the Faculty Council. In May 2020 plaintiff was appointed to professor.

**10.** Plaintiff identifies as homosexual and has been subjected to unlawful sexual harassment by staff and faculty dating back to 2021, which illegal treatment continues to the present date of filing of this complaint. Plaintiff's sexual harassment: **a)** was engendered by a pervasive and severely hostile anti-LGBTQIA + work environment; **b)** complaints were treated with deliberate indifference by various individuals charged with preventing and remedying these violations of defendant's stated policies and Title IX; and **c)** ultimately resulted in retaliation visited upon plaintiff for availing himself of defendant's policies aimed at preventing the continuation of his sexual harassment.

**11.** At all times relevant hereto **defendant** was and still is a private, comprehensive college, originally founded in 1892 as a music conservatory. Defendant was granted accreditation by the

NYS Regents in 1955. Defendant had a reported undergraduate/graduate enrollment of 4,828 students for the 2023/24 academic year. Defendant is comprised of five schools – business; health sciences and human performance; humanities and science; communication; and music/theatre/dance.

**12.** Defendant is managed by a board of trustees, which is the chartered legal entity for the college. The board of trustees is responsible for articulation of general educational policies and academic goals, overall financial management of the college, conferral of degrees to graduates, (upon recommendation of the faculty and president of the college), hiring the president of the college, reviewing and approving proposed changes in academic programs and approving policies related to faculty appointment, promotion and tenure.

**13.** Defendant is the recipient of federal educational funds, mandating its' compliance with Title IX.

NON-PARTY ACTORS

**14. La Jerne Terry Cornish, PhD**. was formerly defendant's provost and senior vice-president for academic affairs, who was originally appointed to that position in July 2018. Dr. Cornish served until August 2021 when she was appointed interim president. Dr. Cornish served as interim president until March 7, 2022, when she was appointed defendant's 10th president by the board of trustees. Dr. Cornish continues to serve as defendant's president at the present time.

4

**15.** From July 2019 until August 2021 plaintiff served under Dr. Cornish, in his position as associate provost for faculty affairs.

**16. Melanie Stein, PhD.** was formerly defendant's dean of the School of Humanities and Sciences, assuming that position in July 2019. When Dr. Cornish was appointed interim president of defendant, Dr. Stein was appointed interim provost in August 2021. In March 2022, Dr. Stein was appointed provost and senior vice president for academic affairs, starting July 1, 2022. Plaintiff served directly under Dr. Stein from July 2021 until June 30, 2022, when he was not re-appointed by her to his position as associate provost for faculty affairs.

**17. Emily Rockett, J.D.** was hired by defendant in 2021 as an assistant counsel dealing with employment and labor matters. In August 2022 Ms. Rockett was appointed defendant's general counsel. Currently, Ms. Rockett serves as defendant's vice president, general counsel and secretary to the board of trustees. As general counsel Ms. Rockett oversees all legal affairs of defendant, including supervision of defendant's Title IX office.

**18.** More specifically, Ms. Rockett assists in the development, interpretation and application of defendant's policies, compliance with federal/state laws and coordination of defendant's response to litigation and federal/state agency inquiries.

**19. Kirra Franzese** was appointed associate vice president of defendant in August 2018. In the fall of 2022, Ms. Franzese was promoted to associate vice president and chief human

5

resource officer of defendant. As chief human resource officer Ms. Franzese plans, directs and

provides leadership in the development of staffing sources to meet defendant's human resource

needs and oversees the administration of defendant's policies related to employment of all staff

and faculty. Ms. Franzese continues in this position at the present time.

20. **Linda Koenig** was appointed defendant's Director of Title IX compliance in October 2017

and continues in that role at the present time. As director of the Title IX office Ms. Koenig is

responsible for ensuring defendant's compliance with Title IX, including investigating reports of

sexual misconduct, harassment and other forms of sexual discrimination and educating the

college community about Title IX's requirements.

21. **Anne Hogan, PhD.** was appointed inaugural dean of defendant's newly created School of

Music, Theatre and Dance (established June 2022). Dr. Hogan undertook her duties at

defendant on July 1, 2022, serving as dean until June 2024, when she accepted a position at

at Chapman University as Dean of the College of Performing Arts.

22. **Steve TenEyck** has been a faculty member at defendant since 2001. In 2021 professor

TenEyck was appointed chairperson of the Department of Theatre Arts. Later, in July 2022,

Professor TenEyck was appointed associate dean of the School of Music, Theatre and Dance,

serving under Dean Anne Hogan. Following Dr. Hogan's departure in July 2024, professor

TenEyck served, with associate dean Luis Loubriel, as an interim dean of the school until

professor TenEyck's appointment in March 2025 as the second dean of the School of Music,

Theatre and Dance.

6

**23. Jennifer Kay** has been a member of defendant's faculty since 2005 and currently serves as chair of the department of music performance within the School of Music, Theatre and Dance. Dr. Kay is an associate professor of voice.

**24. Deborah Martin** has been a member of defendant's faculty since 1992 (piano) and formerly was the chair of the department of music performance within the School of Music, Theatre and Dance. Professor Martin briefly served as interim chair during the spring 2024 semester.

**25. Carly Jo Hosbach-Cannon** is an associate professor of speech language pathology and audiology. Dr. Hosbach-Cannon was appointed in 2016 to her position and additionally serves as the graduate program chair.

**26. Sean Linfors** is an associate professor of Music Education in the School of Music, Theatre and Dance. Dr. Linfors also serves as the interim director of choral activities at defendant, where he directs choral ensembles and teaches conducting, choral rehearsal and choral literature.

GENERAL FACTUAL ALLEGATIONS
**{Title IX Regulations}**

**27.** Title IX of the Education Amendments of 1972 (20 USC §1681(a) provides, in pertinent part, "[N]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance. ..."

**28.** For the 2022-2023 academic year defendant received $117,000,000.00 in overall awards,

(including grants, scholarships, loans and work-study), from the United States Department of Education and other federal sources.

**29.** For the 2023-2024 academic year defendant received $215,000,000.00 in overall awards, (including grants, scholarships, loans and work study), from the United States Department of Education and other federal sources.

**30.** As relevant and material, the 2024 Title IX regulations adopted by the US Dept. of Education were invalidated by the US District Court for the Eastern District of Kentucky, in a January 9, 2025 decision, Tennessee v. Cardona, 2:24-cv-00072 (E.D. Kentucky 2025).

**31.** In light of that decision, the US Dept. of Education, Office of Civil Rights ("OCR") in a February 4, 2025 "Dear Colleague Letter", authored by the Acting Assistant Secretary for Civil Rights, advised that henceforth the OCR *would enforce the 2020 Title IX regulations and not the 2024 regulations*.

**32.** The 2020 Regulations defining "sexual harassment" - (i.e. misconduct on the basis of sex, all of which jeopardize the equal access to education that Title IX is designed to protect, e.g. any instance of *quid pro quo* harassment by an individual; any unwelcome conduct that a reasonable person would find so severe, pervasive and objectively offensive that it denies a person equal educational access; or any instance of sexual assault or stalking) - do not vary in any material respect from defendant's definition of "sexual harassment" as set forth in Policy 2.1 ['Institutional Policy on Sex-Based Harassment'] and Policy 2.6 ['Policy on Sexual Harassment'].

**{Defendant's Policies on Sexual Harassment}**

**33. Policy 2.1 'Institutional Policy on Sex-Based Harassment'** (and other polices

reproduced below, collectively "policies") were created in response to the mandatory

requirements of the 2020 Title IX regulations. As material and relevant this policy provides:

- **§2.1.1 Scope** – "[T]his policy provides procedures for reporting, investigating and adjudicating sex-based discrimination, including sex-based harassment. It applies to all members of the College community, including the College's … faculty and staff and applies regardless of one's sexual orientation, gender, gender identity or gender expression."

- **§2.1.2 Policy Statement** – "[A]s an institution of higher education that promotes the rights and safety of all members of the campus community, Ithaca College does not discriminate on the basis of sex and prohibits sex discrimination. In accordance with applicable law, including but not limited to Title IX of the Higher Education Amendment Amendments of 1972 and its accompanying regulations, Ithaca College prohibits sex-based discrimination, including sex-based harassment against any individual in any College program or activity, including in admission."

- **§2.1.3 Definitions** – Sex-based harassment – "[S]ex-based harassment is a form of sex discrimination and means sexual harassment as defined in Section 2.6 Policy on Sexual Harassment on the basis of sex, including on the basis of sex stereotypes, sex characteristics, … sexual orientation, and gender expression/identity that meets the criteria of one or more of the following three types of conduct: …

  **1. _Quid pro quo_ harassment**. An employee, agent, or other person authorized by the recipient to provide an aid, benefit or service under the recipient's educational program or activity explicitly or impliedly conditioning the provision of such an aid, benefit, or service on a person's participation in unwelcome sexual conduct;

  **2. Hostile environment harassment**. Unwelcome sex-based conduct that, based on the totality of circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity … Whether a hostile

environment has been created is a fact-specific inquiry that includes consideration of the following:

> 1. The degree to which the conduct affected the complainant's ability to access the recipient's educational program or activity -
>
>> i. the type, frequency, and duration of the conduct;
>>
>> ii. the parties' ages, roles within the recipient's education program or activity, previous interactions, and other factors about each party that may be relevant to evaluating the effects of the conduct;
>>
>> iii. the location of the conduct and the context in which the conduct occurred; and
>>
>> iv. other sex-based harassment in the recipient's education program or activity; …"

- **§2.1.4.2 Reporting Sexual Misconduct** – "[A]ny college … faculty member who has been the victim of sexual misconduct is encouraged to seek support and assistance from within or outside the college. … Victims of any form of sex-based harassment are advised that the individuals listed below (are) empowered to institute corrective measures. As such, the following individuals are available to ensure that any report of sex-based harassment or discrimination that they receive will be referred to the Title IX coordinator for an appropriate institutional response. … Title IX Office – Title IX Coordinator, Title IX Investigator … Ithaca College Senior Leadership Team – President, Vice Presidents. It is important to remember that the reporting of sex discrimination, including sex-based harassment, provides the College and the community with the opportunity to identify the person(s) responsible and address the factors that might prevent such occurrences in the future. …"

**34. Policy 2.3 'Non-Discrimination Policy'** – As material and relevant this policy requires:

- **I Scope** – "[T]his policy establishes rights and obligations that are applicable to all members of the College Community including … faculty, regardless of one's … sexual orientation status.

- **III Definitions – Harassment** – "[H]arassment is a form of discrimination that

encompasses unwelcome conduct based on a person's legally protected status. Harassment is unwelcome verbal or physical conduct directed toward, or differential treatment of, an individual because of their membership or perceived membership in any protected group when the conduct is sufficiently severe or pervasive to have the effect of unreasonably interfering with an individual's educational experience, working condition or living conditions. … Examples of conduct that can constitute harassment if based on an individual's legally protected category includes (sic.) but is (sic.) not limited to:

- Epithets, slurs, jokes or negative stereotypes;

- Conduct, whether verbal, physical, written or electronic that threatens, intimidates, offends, belittles, denigrates or shows an aversion toward an individual or group because of their legal protected status;

- Mimicking, mocking, or making fun of a person, including their traits, disabilities, garments, jewelry or displays; (or)

- Making acceptance of such behavior a condition for preferential treatment or maintaining employment or enrollment in an activity or program."

- **IV Requirements –** "Employees and affiliates accused of violations may be subject to investigation and hearing procedures outlined in Section 2.7 (Guidelines for Resolving Discrimination Complaints) … The College may address reports of discrimination through informal means when appropriate. If attempts at informal problem solving are unsuccessful or if the Office of Human Resources … or the Title IX Office, as applicable, determines that an informal approach would be inappropriate or ineffective, the complainant may request resolution through the formal discrimination complaint procedures."

**35. Policy 2.6 'Policy on Sexual Harassment' –** This is defendant's policy dealing

with sexual harassment. As material and relevant this policy states:

- **§2.6.1 General** – "[S]EXUAL HARASSMENT IS ILLEGAL AS A FORM OF SEX DISCRIMINATION, IT IS UNETHICAL, AND IT WILL NOT BE TOLERATED AT ITHACA COLLEGE. … Ithaca College is committed to maintaining a campus environment that promotes dignity and respect for all individuals consistent with the principles of academic freedom. Sexual harassment undermines these ideals as well as

11

the College's overall mission as an educational institution. Ithaca College reaffirms that every member of the College community has a right to an educational and/or employment setting. Sexual harassment is a form of misconduct. Any individual who engages in sexual harassment is subject to sanctions, up to and including termination or dismissal. Supervisory and managerial personnel who knowingly allow such behavior to continue will also be subject to sanctions, up to and including termination."

- **§2.6.2 Definitions – 'Sexual Harassment'** – "[S]exual harassment may take a variety of forms and refers to a broad spectrum of conduct that can range from unwelcome sexual comments to physical assault. Sexual harassment may have different definitions under different federal and state laws. Consistent with the federal regulatory definition of sexual harassment from the US Equal Employment Opportunity Commission (29 CFR 1604.11) and New York State law (Executive Law 296(h)), Ithaca College defines sexual harassment as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

    **1.** submission to such conduct is made either explicitly or implicitly as a term or condition of an individual's (a) employment, (b) academic status or (c) participation in or use of a College sponsored or approved activity or resource; or

    **2.** submission to, or rejection of, such conduct by an individual is used as a basis for (a) employment, (b) academic decisions or (c) other decisions affecting an individual's ability to participate in or use a College sponsored or approved activity or resource; or

    **3.** such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or of creating an objectively and subjectively intimidating, hostile or offensive employment or educational environment; (or)

    **4.** such conduct subjects an individual to inferior terms, conditions or privileges of employment.

In determining whether the alleged conduct constitutes sexual harassment, the College will look at the totality of circumstances, including the nature of the alleged conduct and the context in which the alleged conduct occurred. Determinations will be made from the facts, on a case-by-case basis.

12

Below is a non-exhaustive list containing examples of conduct that could fall within the definition of sexual harassment if it occurs in, or impacts, the employment or academic environment: …

¶ Exchanging sexually charged gestures, noises, remarks, jokes or comments about an individual's actual or imagined sexual behavior, sexual orientation, (or) sexuality, which creates an objective and subjective hostile working or educational environment for the targeted individual or other bystanders. …

¶ Bullying, including but not limited to, … adverse employment/academic action or sabotaging an individual because of, or with reference to, the targeted individual's actual or perceived sex, sexual orientation, gender identity or expression, conformance to assumed sex stereotypes or exercise of their right to bring a complaint of sexual harassment or sexual misconduct."

- **§2.6.2 Definitions – Other Defined Terms – 'Gender Identity or Expression'** – "[I]n accordance with New York State law, the term 'gender identity or expression' means a person's actual or perceived gender-related identity, appearance, behavior, expression, or other gender-related characteristic regardless of the sex assigned to that person at birth, including but not limited to, the status of being transgender (see NY Executive Law §292)."

'**Retaliation**' – "[C]onsistent with the federal regulatory definition of retaliation (see 34 CFR 100.7(e)), Ithaca College defines retaliation as any intimidation, threat, coercion, or discrimination against any individual (1) for the purpose of interfering with any right or privilege secured by College policy or applicable civil rights law, (2) because that individual made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under College policy or applicable civil rights law, or (3) because that individual opposed conduct prohibited by College policy or applicable civil rights law.

No individual shall suffer retaliation, harassment, or other adverse consequences as a result of making a good-faith report of a suspected violation of this policy, or for cooperating in the investigation of such a report. An individual who retaliates against someone who has made such a good faith report and/or cooperated in the investigation of such a report is subject to discipline up to and including termination of employment or expulsion. Intimidation or threats of retaliation against anyone exercising their right to bring a complaint, make an inquiry, or participate in the complaint process will not be tolerated and will be treated as a violation of the College's sexual harassment policy."

'**Sexual Orientation**' – "[I]n accord with New York State law, the term 'sexual orientation' means heterosexuality, homosexuality, bisexuality, or asexuality, whether actual or perceived. (see NY Executive Law §292)"

- **§2.6.3 Responding to Sexual Harassment –** "[R]eports of sexual harassment against any individual should be made to the Title IX Coordinator or to a responsible employee (see College Policy 2.1.4). The College shall respond to complaints of sexual harassment promptly and equitably. Complaints against employees will be resolved using the formal and/or informal procedures of the Ithaca Colleg Guidelines for Resolving Discrimination Complaints (see Policy 2.7)

  Ithaca College may facilitate resolution of complaints through informal means when appropriate. If attempts at informal resolution are unsuccessful, or if the Office of Human Resources … determines that an informal approach would be inappropriate or ineffective, the complainant may request resolution through the formal discrimination complaint procedures. In the discrimination complaint-resolution process, confidentiality will be maintained as appropriate and possible. Individuals who violate this policy are subject to disciplinary action, up to and including dismissal. Tenure, the exercise of academic freedom, years of service, or job-related authority neither insulate individuals from complaints nor influence the enforcement of the College's policy prohibiting sexual harassment."

- **§2.6.6 Enforcement of Policy** – "[R]esponsibility for ensuring enforcement of this policy is delegated to (a) the Office of Human Resources when the alleged harasser is an employee, …Faculty members and staff with supervisory responsibilities are expected to maintain an employment and educational environment that is free of sexual harassment."

**36. Policy 2.7 – 'Guidelines for Resolving Discrimination Complaints'** – This is defendant's policy specifying protocols for resolution of complaints of sexual discrimination. As material and relevant this policy provides:

  **§2.7.1 General** – "[T]he College shall respond to complaints of discrimination promptly, equitably and in accordance with these guidelines. Complaints by … employees against other employees will be resolved using the formal and/or informal procedures of the Ithaca College Guidelines for Resolving Discrimination Complaints."

14

- **§ 2.7.2 Resolution Procedures For Complaints of Sex Discrimination, Including Sex-Based Harassment** – "[I]thaca College complies in all aspects with the laws and regulations required by Title IX.

  All complaints involving allegations of sex discrimination by an individual who is … (an) employee … will be addressed in compliance with Title IX … and in accordance with the *Ithaca College Sex Discrimination Grievance Procedures*…."

SPECIFIC FACTUAL ALLEGATIONS
**{Prefatory Statement}**

37. Plaintiff is a tenured professor in the School of Music, Theatre and Dance. However, plaintiff's sexual orientation, as homosexual, places him in a marginalized sector of the faculty in his school and in the larger community at defendant's institution. Plaintiff's attempts at combating the pervasive and hostile homophobic atmosphere have been met with deliberate indifference by those sitting in the highest positions of authority at defendant's institution, with the means of eliminating this sexual discrimination. Concomitantly, by reason of plaintiff's efforts at combating the sexual harassment he has been treated to retaliation – in terms of demotion in rank, lesser compensation, and a significantly limited scope of institutional responsibilities.

**{Timeline of Events}**

38. In March 2019 plaintiff was appointed by Dr. Cornish to the newly created post of Associate Provost for Faculty Affairs ("APFA"), which was an elevated position with high visibility and access to leaders at defendant's institution.

39. Plaintiff commenced his duties as APFA on July 1, 2019. Plaintiff's initial appointment was

15

for a period of three years, but came with the highly likely prospect of renewal for an additional

three years, based upon plaintiff's indisputable merit and accomplishments as noted *infra*.

**40.** From July 2019 through July 2021, plaintiff successfully transitioned faculty tenure and

promotion files from paper to electronic format, updated the faculty handbook after ten prior

years of failed attempts, updated various policies and received provost, president and board of

trustee approval for the changes.

**41**. Perhaps the most difficult work plaintiff was assigned during this period (fall 2020 –

spring 2021) was defendant's Academic Program Prioritization ("APP"). The APP process was

designed to eliminate academic programs and faculty lines no longer viable for defendant during

its' time of fiscal crisis.

**42.** For his dedicated and successful work as APFA, plaintiff received praise from president

Collado, provost Cornish and defendant's board of trustees.

**43.** In July 2021 president Collado resigned her position and Dr. Cornish was appointed as

interim president. Dr. Stein, then Dean of the School of Humanities and Science was appointed

interim provost. In that position Dr. Stein became plaintiff's supervisor.

### [August 2021 – December 2021]

**44.** After undertaking her duties as provost, Dr. Stein evinced a management style quite different

than that of Dr. Cornish, who had a "hands-off" approach as supervisor, often stating to

plaintiff: "you have a job to do, and I'm not going to get in your way of doing it."

**45.** By comparison, in September 2021 plaintiff became acutely aware that Dr. Stein had

a different supervisory approach in relation to his work (as opposed to the work of the other

two associate provosts who were heterosexual), often raising her voice in anger or frustration if

plaintiff tried to explain a college policy she didn't like or comprehend, in addition to prioritizing

and micro-managing plaintiff's assigned tasks.

**46.** Dr. Cornish had allowed plaintiff to work one week each month remotely from the time when

employees were returning to the office, post-vaccination during the COVID pandemic. During

that one week/month period, plaintiff worked remotely from his apartment in New York City. Dr.

Cornish assured plaintiff that this arrangement could continue in July 2021, after she met with

provost office staff to inform them that she had accepted the role of interim president and was

appointing Dr. Stein as interim provost. Upon reminding Dr. Stein of this arrangement, she told

plaintiff that she might approve him working remotely "a day or two" at a time, but not a week

and indicated that permission to do so would be required in advance. Neither of the other

associate provosts, who were heterosexual, needed permission to work remotely in advance.

**47.** Throughout the fall of 2021 Dr. Stein continued to solicit plaintiff's knowledge and

support in her new post as interim provost. However, by December 2021, Dr. Stein had then

settled into her new role and no longer needed nor sought plaintiff's counsel and advice. It was at

this juncture plaintiff realized Dr. Stein did not want him on her team as an associate provost; not

for any deficiency in work performance or its timely completion, but rather because of

plaintiff's sexual orientation as a gay man.

**48.** Parenthetically, it is important to note that the provost's job is one of the most powerful and

prestigious in defendant's institution and other associate provosts, deans, faculty chairs, and

faculty members were loath to correct, challenge or report Dr. Stein for her behaviors toward

plaintiff.

**49.** By way of examples, at various meetings of the provost, associate provosts and deans,

Dr. Stein continually interrupted plaintiff in front of other attendees, often contorting her face

and looking around the room to elicit similar reactions from her subordinate staff and deans.

**50.** On other occasions, when Dr. Stein invited plaintiff's views about his associate provost's

position and the campus climate, plaintiff candidly told her that he thought he was treated

differently and in a more judgmental manner because of his sexual orientation as a gay man. In

this vein, at various times Dr. Stein had appraised plaintiff in these terms, exclaiming – "You're

too sensitive", "You're too thin skinned", "You're too dramatic" and "You need to be tougher if

you want to do this work" – which plaintiff contends are code phrases for "You are too gay",

having nothing to do with plaintiff's performance in his role as associate provost.

**51.** In a subsequent phone conversation with Dr. Stein, in which she again told plaintiff that he

was being "too sensitive", plaintiff responded that Dr. Stein would not have used that

characterization if he were a heterosexual man. Whereupon Dr. Stein became angry and

defensive, denying that her language was problematic, dismissively stating she had supervised

other gay men in the past.

**52.** At a meeting between Dr. Stein and plaintiff in December 2021, Dr. Stein was trying to

remember words plaintiff had used at an earlier meeting. While relating what plaintiff had

allegedly stated at that time, Dr. Stein began imitating plaintiff (in exaggerated gestures and

volume – Dr. Stein's voice rose in pitch, her body movements became frantic and spastic, with

Dr. Stein waiving her hands around her head in limp-wristed fashion).

**53.** After being subjected to this additional instance of sexual harassment plaintiff reported Dr.

Stein's homophobic impression to Dr. Cornish, Dean Claire Gleitman (School of Humanities

and Science) and Kirra Franzese. In an apparent effort to deflect and minimize her inappropriate

"performance" of plaintiff Dr. Stein met with Dr. Cornish, disingenuously telling Dr. Cornish

plaintiff was creating "dysfunction" in the provost's office, impairing its smooth

operation.

**54.** When a dean's position opened in the School of Music Theatre and Dance, for which plaintiff

was highly qualified and nominated for, Dr. Stein told plaintiff that he could certainly apply for

that position but wouldn't be given an interview. Dr. Stein stated that she "needed someone in

that role who was 'stronger' and 'less thin-skinned'."

### [January 2022 – July 2022]

**55.** At a previously scheduled meeting with Dr. Cornish to discuss plaintiff's future career goals,

she broached the topic of plaintiff's alleged dysfunctional behavior, as related by Dr. Stein.

When plaintiff recited the homophobic behaviors he was subjected to by Dr. Stein, Dr. Cornish

curtly remarked – "Melanie Stein will never have been accused of any of these things before."

56. Dr. Cornish, instead of directly and informally intervening to curtail Dr. Stein's sexual harassment of plaintiff, placed responsibility for ending this behavior solely on plaintiff. Dr. Cornish advised plaintiff to use certain language when addressing his perceived sexual discrimination with Dr. Stein.

57. In light of Dr. Cornish's failure to assist plaintiff, he contacted Kirra Franzese, the Associate Vice President for Human Resources, and reported the continuing sexual harassment which Dr. Stein visited upon plaintiff beginning in the fall of 2021 and continuing into 2022.

58. In response to plaintiff's notification of his sexual harassment by Dr. Stein, Ms.Franzese stated, nothing could be done. While Ms. Franzese acknowledged the interpersonal problems plaintiff was having with Dr. Stein, as she determined there were no actionable violations of defendant's policies, she told plaintiff she wouldn't do anything.

59. Notwithstanding her initial conclusion, and in an apparent attempt to informally resolve plaintiff's claims of sexual discrimination, Ms. Franzese attended a regular weekly meeting between Dr. Stein and plaintiff, with each party's consent. At that meeting, plaintiff related the instances of sexual discrimination and bullying he alleged Dr. Stein practiced against him. In the course of that meeting, Dr. Stein announced that "she was so angry right now" and the discussion ended abruptly without any resolution of plaintiff's claims.

60. After the conclusion of this abortive meeting, Ms. Franzese followed plaintiff back to his

office and stated she worried Dr. Stein was actually angry with her, (seemingly unconcerned with

the reasons or basis of plaintiff's complaints which prompted that meeting).

**61.** Shortly after the informal meeting, Dr Stein offered plaintiff "professional coaching" with an

outside consultant. Dr. Stein's stated goals for plaintiff to achieve included the following:

    **a)** assume good intentions on the part of co-workers, so all can productively complete work;

    **b)** resolve professional disagreements with co-workers in a collegial manner in order

    to continue working productively; and

    **c)** achieve a balance between adhering to established process and protocols and responding

    with flexibility and compromise where needed to achieve work goals.

No goals, as to improvement of the interpersonal relationship between Dr. Stein and plaintiff,

nor any "coaching" of Dr. Stein as to the mandates of defendant's Policy 2.1 and 2.6, were

mentioned.

**62**. Because plaintiff's underlying complaints of sexual harassment by Dr. Stein continued to be

unaddressed by the responsible officials at defendant's institution, plaintiff rejected the offer of

'coaching' made by Dr. Stein as mere 'window dressing' and an exercise in futility.

**63.** Following plaintiff's rejection of Dr. Stein's offer of professional coaching, she advised

plaintiff that she was not contemplating a renewal of his associate provost position for a second,

three-year term. In fact, Dr. Stein hired a straight white male, Associate Professor Brendan

Murday to replace Plaintiff.

64. By reason of his non-renewal as associate provost for faculty affairs, plaintiff was returned to the teaching faculty in the School of Music, Theatre and Dance on July 1, sustaining a large cut in salary and black mark on his resume.

65. After plaintiff's demotion and return to the teaching faculty, Dr. Stein reached out to speak with him and offered plaintiff a sabbatical leave for the fall 2022 semester, in an apparent effort to appear compassionate. Plaintiff accepted the sabbatical offer and was on leave in the fall.

### [August 2022 – June 2023]

66. Dr. Stein's harassment continued after plaintiff's demotion, when she reported negatively about him to Ann Hogan, the newly appointed dean of the School of Music, Theatre and Dance.

67. When plaintiff returned to the teaching faculty, he worked diligently to establish a healthy rapport with Dean Hogan, who quickly came to recognize plaintiff's value. Dean Hogan was reported to have stated – "I do not understand. What was Melanie's (Provost's) problem with Brad? He seems so great."

68. Defendant's discrimination against plaintiff continued during the spring semester of 2023, plaintiff's first semester back teaching after a three-year hiatus. Another example was the omission of plaintiff's name from programs on choral concerts. Plaintiff first learned of this when several of his students told him about his absence from the programs.

69. When plaintiff brought this omission to the attention of Dean Hogan, Dr. Linfors contacted plaintiff and stated that the absence of plaintiff's name and credentials from the programs

was entirely inadvertent, explaining that the failure was attributable to a "cut and paste" of an earlier program template.

70. Significantly, plaintiff was on the teaching faculty for the fall semester of 2022 (albeit on sabbatical leave) and another *straight* faculty member, Dr. Kay, who was also on sabbatical leave during the fall semester of 2022, did not similarly have her name left off the performance programs, nor her faculty replacement.

71. Following plaintiff's disclosure of this *faux pas* to the dean, the archival programs for the spring 2023 concerts were altered to cover up this "mistake". This experience was painful and demeaning to plaintiff, as well as for plaintiff's students, who were proud to call him their teacher, and his faculty replacement, Andrea Bickford.

72. For students whom plaintiff recruited to the School of Music, Theatre and Dance, Plaintiff's name was not shown beside them in the faculty contact column of the "smart sheet", until plaintiff requested that this "oversight" be corrected. However, without any input request on plaintiff's part, his name did appear in the red section of that same smart sheet if a recruited student did not enroll in the School.

73. During the admissions process, plaintiff's recommendations on pre-screened candidates were routinely overturned in favor of straight faculty's recommendations. In an attempt to ascertain why this occurred with such frequency, plaintiff's contacts with the admissions office were rebuffed or ignored.

**74.** In faculty meetings, plaintiff was constantly interrupted, while other faculty were allowed to speak. During lively interactions among faculty members, plaintiff was remonstrated if he interjected his opinions on matters under discussion. Additionally, meetings were scheduled in accord with the itineraries of straight colleagues so that plaintiff was often forced to attend meetings via Zoom platform in order to participate.

**75.** In a conversation with Dean Hogan, plaintiff was asked to list the homophobic microaggressions he was experiencing during the spring 2023 semester. Having no advance warning that this topic was going to be discussed plaintiff had to relive very triggering experiences, describing these in detail including criticism of plaintiff's mode of speech, as being "gay" because of a perceived lisp. As each example was recounted, Dean Hogan's riposte was that plaintiff was wrong to perceive homophobia in that conduct or response by others.

**76.** Because plaintiff was beginning to doubt his own clear perceptions of homophobia practiced against him, he eventually contacted Dr. Hosbach-Cannon, after an initial contact with another colleague. Dr. Hosbach-Cannon advised plaintiff that she thought he had a wonderful voice and speaking pattern, having gained that knowledge in countless interactions with plaintiff when he served as associate provost. But, if plaintiff wanted to seek speech pathology services for any speech or voice modification she would be happy to help, adding that she worked with LGBTQIA + community members who wanted or needed to modify their speech, in a given

situation (e.g. for safety, transitioning or job necessity).

77. During this time frame defendant developed a committee, in conjunction with creating new

by-laws, named the Faculty Advisory Group (FAG). Parenthetically, it is common on campus for

committees to become known by their acronyms. No one noticed the acronym until plaintiff

pointed it out.

78. Plaintiff was one of the original appointees to this committee. At committee meetings

various members continued to employ the acronym FAG, in referring to the Faculty Advisory

Group.

79. When plaintiff pointed out to committee members the harmful nature of the acronym, certain

members and the Dean agreed that the committee should not be referred to by its acronym.

However, despite acknowledging that the acronym should not be used, various straight members

of the committee continued to employ that term.

80. Given this atmosphere, plaintiff had to continually address the difference between

"offensive" and "harmful" when the acronym was used. Dean Hogan reported to the committee

that Dr. Stein had requested her to continue with the public process required by the new bylaws

for changing the name of the committee, which required a motion, discussion and voting over a

period of time. During the discussion phase, plaintiff was required to explain the need for the

change.

81. During these public discussions the acronym was repeatedly brought up in plaintiff's

presence with the intent of 'offending' him. Ultimately the name of the committee was changed and no acronym was ascribed; yet, the process of being repeatedly subjected to numerous public discussions, over such an obviously discriminatory reference, was painful and humiliating to plaintiff.

82. Dr. Stein, Dean Hogan and various School of Music, Theatre and Dance employees, by their repeated use of FAG, constantly engendered a sexually hostile and discriminatory climate on campus, victimizing plaintiff.

83. In the fall of 2023 plaintiff was serving as a member of a search committee formed to identify a new tenure track faculty member in the Department of Music Performance. While there were several internal candidates, none were ultimately selected as finalists for that tenure track position. The finalists were identified by mid-December 2023. At that time, Dr. Kay served as the chair of the search committee.

84. Dr. Kay did not continue to chair the committee, as she took a medical leave of absence for the spring 2024 semester. Dean Hogan asked that plaintiff step in to head the committee, which he accepted. During Dr. Kay's medical leave, Dr. Martin was appointed interim chair of the department of music performance.

85. Dr. Martin, after learning that no internal candidates had been chosen as finalists, contacted Dean Hogan, without plaintiff's prior knowledge, alleging that plaintiff had "problems" with certain internal candidates, as evidenced by his reporting the candidates

to associate vice-president and HR chief Franzese, for alleged policy violations and (as an

institutional required reporter) to Title IX for accusation of sexual harassment.

**86.** While Dr. Martin initially made these false contentions to Dean Hogan, she later admitted

the allegations were wrongfully leveled against plaintiff. In this regard several factors.

warrant mention. First, the finalist candidates had already been chosen in December 2023,

when Dr. Kay chaired the committee. Second, the list of finalists had been approved by Dean

Hogan and Provost Stein. Third, two of the three committee members had previously

recommended the finalists to both Dean Hogan and Provost Stein.

**87.** Significant in this regard is the fact that both Dean Hogan and Dr. Martin only asked plaintiff

to justify the finalist candidates, specifically inquiring of plaintiff why the internal candidates

were not finalists. Put more succinctly, the gay member of the search committee, not the other

straight members from her department, was the one called upon to justify the finalist list (already

chosen under the committee chairpersonship of Dr. Kay).

**88.** Plaintiff asked Dr. Martin why she had made these unfounded accusations against him, and

she refused to answer. In an effort at conciliation Dean Hogan and Associate Dean Luis Lubriel

agreed to meet with Dr. Martin.

**89.** When plaintiff explained to Dr. Martin that he was being targeted as a member of a

marginalized group, she retorted she was marginalized as a conservative, registered republican,

evangelical Christian living in Ithaca. In reply, plaintiff had to again reiterate that being a

member of a political minority in the college community and being a member of a systematically

marginalized and protected group were two entirely distinct matters. Nevertheless, Dr. Martin

didn't agree, and neither Dean Hogan nor Associate Dean Lubriel supported plaintiff's position.

**90.** Dr. Martin, through her actions and discriminatory treatment of plaintiff as an openly gay

faculty member, discredited plaintiff and created a more toxic educational environment for him to

work in.

**91.** Dean Hogan and Associate Dean Lubriel, by their inaction in the face of Dr. Martin's

homophobic treatment of plaintiff, likewise contributed to the toxic anti-gay environment,

by not taking definitive correction action.

### [January 2024 – March 2025]

**92.** Another example of discriminatory treatment of plaintiff occurred at the beginning of the

spring 2024 semester when he was summoned by Dean Hogan and coerced into teaching

a course for which he had no prior notice, experience  or time to prepare for.

**93.** In "requesting" that plaintiff teach this course, Dean Hogan stated that by undertaking

this task, plaintiff would alleviate some of the ill-will exhibited against him by certain

faculty in the school, arising from his alleged actions while sitting as replacement chair of the

faculty search committee.

**94.** Important in this vein is the irrefutable fact that no other straight faculty member was

coerced into teaching a course for which he/she had not prior curriculum experience, let alone on

a single day's notice.

**95.** In reference to the alleged discriminatory events recited in ¶¶ "66" – "94" above, plaintiff contacted Associate Vice President/Chief Resource Officer Franzese via email in May 2024 regarding the allegations. Ms. Franzese did not respond until a period of twelve days had elapsed.

**96.** In a responsive email to Ms. Franzese plaintiff stated (given the undue delay in response by her) that he was registering his complaints of discriminatory sexual treatment and was aware of his rights. Ms. Franzese did not undertake any action on plaintiff's behalf.

**97.** As material and relevant, in an Annual Faculty Activity Report for calendar year 2023, (submitted in 2024) plaintiff wrote the following under the heading 'Faculty Planning - Self Evaluation':

> "[I] am having a hard time surviving the toxic hetero-normative and anti-gay atmosphere at Ithaca College and in my school. I am the only person in meetings that anyone interrupts without apology. I have my words either ignored or needing reaffirmation from a white straight before they are considered. I am constantly asked to explain why I 'feel' that this environment of predominantly progressive straight white folks is homophobic, which requires me to relive painful interactions with colleagues and allows the straight white folks to play judge about whether something is homophobic or not. I show up and I work very hard, and I make difficult decisions based on evidence. I fall under a different lens of scrutiny than my straight colleagues. In other instances, during committee meetings with lots of lively discussion and overlapping commentary, I am scolded by faculty members for interrupting. 'You didn't let me finish!' and similar (in raised voice, meant to shame me). No one else is scolded. Just me, the gay man in these conversations. I could recount endless other instances of this, but I won't. I have to accept that Ithaca College will not follow up with this. Still, I show up with a positive attitude and a smile on my face. … I am an excellent teacher. I want to continue to grow and develop my knowledge and pedagogy, and I have been and will continue so to do. My students appreciate me and my work, even though I am gay. …"

{Dean's Response to Self-Evaluation]

"[B]rad – Your student statements clearly affirm that you are an exceptional teacher, and I want to express my appreciation for your outstanding service contributions to MTD. It was a pleasure to work with you on the T and P training sessions, and on the MTD Faculty Senate and IDEA-B Committee, where your input was significant and highly valued. …Thank you for sharing with me that you are having a hard time surviving the atmosphere at IC, and that you feel that IC will not follow up. I acknowledge how difficult it must be for you to share your lived experience once again. I encourage you to reach out to those you feel can support you and to consider the resources at IC that are available to you. I respect and value your contributions to the school and to your students, and I hope that you will find next year to a productive, rewarding and more enjoyable one."

**98.** Following up on the Dean's suggestion, plaintiff contacted the Title IX office and spoke with Linda Koenig, relating the sexual harassment he had suffered. A detailed written narrative of plaintiff's harassment was sent to Ms. Koenig on April 2, 2024.

**99.** In response to plaintiff's conversations and email, Ms. Koenig stated that while she could take action, it wouldn't result in anything significant because of the individuals involved. Instead, Ms. Koenig suggested a non-Title IX avenue to pursue (which was unavailable because of expiration of the applicable statute of limitations).

**100.** In March 2025 plaintiff discovered that a number of recorded auditions of prospective applicants to the School of Music, Theatre and Dance had not been fully processed by faculty, meaning that in some cases only one faculty member had evaluated the recordings. In the case of some applicants no faculty member had yet evaluated the recordings.

**101.** When plaintiff discovered this state of affairs, he knew that the applicants and their families

would be awaiting the results of the auditions. In light of this, plaintiff proposed evaluating the unreviewed auditions himself, as second evaluator or as a sole evaluator, with the approval of the Associate Dean of the School of Music, Theatre and Dance.

**102.** In response to plaintiff's offer of assistance the Associate Dean replied that every applicant audition required a second faculty evaluator, which plaintiff accepted. Plaintiff continued to evaluate the auditions with another faculty member to ensure the continued flow of completed audition reviews.

**103.** Plaintiff later learned that another heterosexual colleague of his in the School of Music, Theatre and Dance (with many lesser years of teaching and faculty experience) had been permitted to be a sole evaluator on a number of these applicant auditions, without a secondary evaluator required to finalize the review process.

**104.** In those instances where plaintiff had initially been the sole evaluator, he was required to solicit another faculty member, as a secondary evaluator, to finalize the processing .

**105.** In other words, defendant required the second opinion of a straight colleague in order for an application of a prospective enrollee to be processed by plaintiff, but this same requirement was not imposed on his heterosexual colleagues.

**106.** As material and relevant, in an Annual Faculty Activity Report for calendar year 2024 plaintiff wrote the following, under the heading 'Faculty Planning – Self Evaluation':

> "[I]'m an outstanding faculty member. I believe that my teaching is head and shoulders above the standard of excellence that is expected of others in our

school. As a member of the LGBTQIA + community, I continue to have to deliver at a level that far exceeds expectations in order to be valued, and it is exhausting. … I hope to manage the discrimination I face daily from the college so that I can continue to do my job. As a result of this toxic environment, my mental health continues to challenge me, but I have sought professional support, at great personal financial cost, and I hope to make headway. … I arrived at further clarity about how I am often treated. When I muster up the courage to mention how I've been mistreated by colleagues, my supervisor might say – 'I'm sorry you feel that way.' This response, of course, suggests that I am imagining my lived experience. Microaggressions and discrimination aren't imagined. They are real. … My previous dean encouraged me to reach out to campus resources that are available to me, which I was grateful for. However, those resources are impotent and the college continues to deny that I am suffering. They continue to harm me and allow me to be harmed by others. It is a toxic environment. I am scapegoated in the voice area. My questions raised in my area are often perversely twisted and then weaponized against me, so as to create mistrust among our group. … I am vilified. I live in a culture where my voice is constantly vilified. I am grateful to Steve (Dean TenEyck) and Luis (Associate Dean Lubriel) for their support and help … ."

### AS AND FOR A SOLE COUNT AGAINST DEFENDANT
### [Violations of Title IX and Defendant's Policies 2.1 and 2.6]

**107.** Plaintiff repeats and re-alleges, as material and relevant, each of the statements set forth in ¶¶ "1" – "106", above.

**108.** Title IX of the Educational Amendments of 1972 prohibits discrimination on the basis of sex in educational programs and activities which receive federal funds. [¶ "27"]

**109.** Defendant was the recipient of federal educational funds in 2023 and 2024. [¶¶ "28", "29"] Upon information and belief defendant has received or will receive federal educational funds in 2025.

**110.** Defendant violated the provisions of Title IX by allowing plaintiff to suffer unlawful discrimination, on the basis of his protected orientation as a gay male, at the hands of its administrators and faculty of which it had actual notice.

**111.** Additionally, in the face of plaintiff's complaints of sexual discrimination, defendant took no action, instead retaliating against him for seeking assistance in conformity with defendant's own policies. [¶¶ "1", "37"]

**112.** As a consequence of defendant's actions and omissions, a homophobic environment was created and allowed to exist on campus by defendant, so severe, pervasive and objectively offensive, it deprived plaintiff access to the educational opportunities and benefits which would otherwise have been available to him. [¶ "10"]

**113.** Plaintiff perceived the environment on campus to be hostile and abusive and, in fact, it was permeated with discriminatory intimidation, ridicule and insult sufficiently severe as to alter the educational environment within which plaintiff was forced to teach, mentor and evolve. [Id.]

{**Sexual Harassment/Hostile Educational Environment**}

**114.** The alleged hostile educational environment, in which plaintiff's sexual harassment by faculty, staff and administrators existed, began in 2021 and continues to the present.

**115.** The genesis of this toxic educational environment was attributable to the conduct of the second highest administrator at defendant's institution, Dr. Stein. Beginning in the late fall of 2021, as became manifest through her unjust criticisms, micro-management and homophobic

33

actions, Dr. Stein sexually harassed plaintiff. [¶¶ "50", "51", "52", "54", "66", "67"]

116. Because of Dr. Stein's obvious position of power at defendant, other administrators, deans, faculty chairs and faculty took note that there were no apparent consequences for the sexual harassment of plaintiff. [¶¶ "48", "49"]. Essentially, these other faculty and staff were given a "green light" to similarly harass plaintiff, if they were pre-disposed to do so, without fear of reprisal or disciplinary action.

117. In fact, other faculty and staff did sexually harass plaintiff in numerous ways, the cumulative result of which was the continuation of a toxic atmosphere in which plaintiff was repeatedly and insidiously victimized. [¶¶ "68", "69", "70", "71", "72", "73", "74", "77", "78", "79", "80", "81", "82", "83", "85", "86", "87", "88", "90", "91", "92", "93", "94", "97", "100", "101", "102", "103", "104" and "106"]

118. These foregoing instances of homophobic conduct directed toward plaintiff were objective indicators of an actual and objective hostile environment permeated with sexually discriminatory intimidation.

119. Plaintiff subjectively perceived the foregoing examples of homophobic conduct to be hostile and abusive, and permeated with sexually discriminatory intimidation, ridicule and insult sufficiently severe and pervasive to alter the conditions of his educational environment, such that he was effectively barred access to educational opportunities and benefits at defendant's institution. [¶¶ "97" and "106"]

**{Deliberate Indifference}**

**120.** Defendant acted with deliberate indifference to plaintiff's claims of sexual harassment

when its response was clearly unreasonable, inadequate and/or untimely, in light of its actual

knowledge of the pertinent circumstances.

**121.** Defendant acted with deliberate indifference to plaintiff's claims of sexual harassment when

its' senior officer and other administrators, charged with taking action pursuant to the mandates

of Policy 2.1 ('Institutional Policy on Sex-Based Harassment') and Policy 2.6 ('Policy on Sexual

Harassment'), turned a 'blind eye' to the indisputable evidence brought to their attention by

plaintiff. [¶¶ 33 @ §2.1.4.2 and 35 @ §2.6.3]

**122.** Specific examples of defendant's deliberate indifference include:

   **a) Dr. Cornish's** inaction when plaintiff related the alleged sexual harassment perpetrated by

   Dr. Stein [¶¶ "53", "55", "56"];

   **b) Ms. Franzese's** inaction when plaintiff advised her of the sexual harassment perpetrated

   by Dr. Stein [¶¶ "57", "58", "59", "60", "95", "96"];

   **c) Dean Hogan's** inaction when plaintiff advised her of the sexual harassment perpetrated by

   various faculty [¶¶ "68", "69", "75", "88", "91"]; and

   **d) Linda Koenig's** inaction when plaintiff advised her of the sexual harassment perpetrated

   by Dr. Stein and various faculty [¶¶ "98", "99"]

**{Retaliation}**

**123.** Defendant, through the actions of Dr. Stein, retaliated against plaintiff after he engaged in

protected activity under Title IX and Policy 2.1 (§2.1.4.2) [¶ "33"] and Policy 2.6 (§2.6.2)

[¶ "35"] by reporting Dr. Stein's sexual harassment to Dr. Cornish and Ms. Franzese. [¶ "122 a)

and b)" above].

**124.** Dr. Stein's retaliation against plaintiff consisted of her unjustified refusal to renew plaintiff

as Associate Provost for Faculty Affairs, in the face of plaintiff's unquestioned diligent and

successful work for which he received accolades from the Dr. Cornish and Board of Trustees

[¶¶ "42", "47"], notwithstanding Dr. Stein' pretextual statement to Dr. Cornish that plaintiff was

creating dysfunction within the Provost's office. [¶ "53"].

**125.** An additional act of retaliation by Dr. Stein against plaintiff involved her blocking

plaintiff's candidacy for appointment as a dean within the School of Music, Theatre and Dance,

by her refusal to allow plaintiff an interview for that position. [¶ "54"]

**126.** There was a proximate causal connection between plaintiff's protected activity of reporting

Dr. Stein's sexual harassment, under Title IX and Policies 2.1 and 2.6, and the adverse

employment actions Dr. Stein took against plaintiff, which temporally followed plaintiff's

protected activity.

**127.** Defendant's actions and omissions aforesaid caused plaintiff physical and mental injuries,

together with loss of income, proximately related to its' violations of Title IX and Policies 2.1

and 2.6.

**128.** Defendant's actions and omissions aforesaid were willful, wanton and reckless, evincing a criminal disregard for its statutory and self-imposed duties under Title IX and Policies 2.1 & 2.6.

{Prayer for Relief}

**WHEREFORE,** plaintiff respectfully requests the following relief against defendant:

**i)** an award of compensatory damages in such amount as the trier of fact may find for plaintiff's mental and physical pain and suffering, reputational damage, medical costs, diminution and loss of income and other economic loss and benefits, arising from the sexual discrimination he suffered;

**ii)** an award of punitive damages in such amount as the trier of fact may find for defendant's highly negligent, reckless and/or deliberate conduct, which evinced a criminal indifference by defendant to plaintiff's statutorily and institutionally conferred rights and obligations, arising from the discrimination he suffered;

**iii)** an award of reasonable attorney's fees in such amount as the trier of fact may find; and

**iv)** for such other and further relief, including statutory costs, disbursements and interest on any award ultimately rendered, as to the Court may seem just and proper.

{Jury Demand}

Plaintiff respectfully demands a trial by jury of all permitted issues in this action.

**Dated:** April 23, 2025

Respectfully submitted by:
PHETERSON SPATORICO LLP

by:

Steven A. Lucia, Esq., of counsel
Attorneys for Plaintiff
145 Culver Road
Rochester, New York 14620
(585) 360-1221
steven.lucia@psnlawgroup.com
NYS Bar registration #: 2298388
NDNY Bar Roll #514441