UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

BRAD HOUGHAM,

                        Plaintiff,

                                                    Case No.: 25-cv-529 (AJB/MJK)

-vs-

TRUSTEES OF ITHACA COLLEGE,

                        Defendant.

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ITHACA COLLEGE'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

HODGSON RUSS LLP
1800 Bausch & Lomb Place
Rochester, New York 14604
(585) 454-0700

*Attorneys for defendant Ithaca College*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT .......................................................................................... 1

THE ALLEGATIONS IN PLAINTIFF'S COMPLAINT ................................................ 1

*March 2019 to December 2021* ........................................................................... 2

*January 2022 to July 2022* ................................................................................. 4

*August 2022 to June 2023* ................................................................................. 5

*January 2024 to March 2025* ............................................................................ 8

ARGUMENT ....................................................................................................................... 10

I.    THE RIGHTS AND REMEDIES UNDER TITLE VII PRECLUDE CLAIMS FOR EMPLOYMENT DISCRIMINATION UNDER TITLE IX ......................................................................... 11

II.   SEVERAL OF THE ALLEGED DISCRIMINATORY AND RETALIATORY ACTS ARE NONACTIONABLE ........................................................................................................ 14

III.  PLAINTIFF'S TITLE IX CLAIM FAILS BECAUSE HE PLEADS NO FACTS SUPPORTING AN INFERENCE OF DISCRIMINATORY ANIMUS, SEVERE OR PERVASIVE CONDUCT, OR DELIBERATE INDIFFERENCE ................................................................................ 15

    A.    PLAINTIFF FAILS TO PLEAD FACTS SUPPORTING AN INFERENCE OF DISCRIMINATORY ANIMUS ....................................................................................................... 16

    B.    PLAINTIFF FAILS TO PLEAD SEVERE OR PERVASIVE CONDUCT .................................. 20

    C.    PLAINTIFF ALSO FAILS TO PLAUSIBLY PLEAD DELIBERATE INDIFFERENCE ............... 21

IV.   PLAINTIFF CANNOT RECOVER EMOTIONAL DISTRESS DAMAGES UNDER TITLE IX . 23

CONCLUSION .................................................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Acosta v. City of New York*,
2012 U.S. Dist. LEXIS 60460 (S.D.N.Y. Apr. 26, 2012) ......................................................16

*Alford v. Guise*,
2025 U.S. Dist. LEXIS 69896 (W.D.N.Y. Apr. 11, 2025) ....................................................20

*Annabi v. New York Univ.*,
2024 U.S. Dist. LEXIS 169857 (S.D.N.Y. Sept. 20, 2024),
*aff'd* 2025 U.S. Dist. LEXIS 8324 (2d Cir. Apr. 9, 2025)..............................................18, 20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................................................................................10

*Barnes v. Rochester City Sch. Dist.*,
2024 U.S. Dist. LEXIS 230960 (W.D.N.Y. Dec. 20, 2024) ..................................................13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .............................................................................................................10

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022) .............................................................................................................23

*Curto v. Edmundsom*,
392 F.3d 502 (2d Cir. 2004) ................................................................................................14

*Davis v. Monroe County Bd. of Educ.*,
526 U.S. 629 (1999) ................................................................................................11, 21, 22

*Davis-Molinia v. Port Auth. of N.Y. & N.J.*,
2011 U.S. Dist. LEXIS 93868 (S.D.N.Y. Aug. 19, 2011)....................................................21

*Doe v. Columbia Univ.*,
831 F.3d 46 (2d Cir. 2016) ..................................................................................................17

*Doe v. State Univ. of N.Y. Purchase Coll.*,
2024 U.S. Dist. LEXIS 171440 (S.D.N.Y. Sept. 23, 2024)..................................................16

*Doe v. Syracuse Univ.*,
2023 U.S. App. LEXIS 29741 (2d Cir. Nov. 8, 2023) ....................................................16, 21

*Doe v. Torrington Bd. of Educ.*,
179 F. Supp. 3d 179 (D. Conn. 2016) ..................................................................................20

*Doe v. Trs. of Columbia Univ.*,
   2022 U.S. Dist. LEXIS 153239 (S.D.N.Y. Aug. 25, 2022) ....................................23

*Flemming v. MaxMara USA, Inc.*,
   371 F. App'x 115 (2d Cir. 2010).............................................................. 20, 21

*Ghartey v. St. John's Queens Hosp.*,
   869 F.2d 160 (2d Cir. 1989) .........................................................................11

*Gordon Niagara Wheatfield Cent. Sch. Dist.*,
   2023 U.S. Dist. LEXIS 147735 (W.D.N.Y. Aug. 21, 2023) ...............................23

*Harris v. Forklift Sys.*,
   510 U.S. 17 (1993)......................................................................................12

*Hayut v. State Univ. of N.Y.*,
   352 F.3d 733 (2d Cir. 2003)........................................................................22

*Joseph v. Bd. of Regents of the Univ. Sys. of Ga.*,
   121 F.4th 855 (11th Cir. 2024) ....................................................................13

*KF v. Monroe Woodbury Cent. Sch. Dist.*,
   2012 U.S. Dist. LEXIS 60341 (S.D.N.Y. Apr. 30, 2012) ..................................22

*Lakoski v. James*,
   66 F.3d 751 (5th Cir. 1995).........................................................................13

*LaSalle v. City of New York*,
   2015 U.S. Dist. LEXIS 41163 (S.D.N.Y. Mar. 30, 2015)...................................20

*Littlejohn v. City of New York*,
   795 F.3d 297 (2d Cir. 2015) .................................................................. 17, 20

*Maria v. Mass Inst. of Tech.*,
   2024 U.S. Dist. LEXIS 176972 (S.D.N.Y. Sept. 30, 2024)................................15

*Pungitore v. Barbera*,
   506 F. App'x 40 (2d Cir. 2012) ...............................................15, 17, 18, 19

*Roe v. St. John's Univ.*,
   91 F.4th 643 (2d Cir. 2024).........................................................................15

*Soriano v. Bd. of Educ.*,
   2004 U.S. Dist. LEXIS 21529 (E.D.N.Y. Oct. 27, 2004)...................................23

*Staehr v. Hartford Fin. Servs. Group*,
    547 F.3d 406 (2d Cir. 2008) ...................................................................10

*Tolbert v. Smith*,
    790 F.3d 427 (2d Cir. 2015) ...................................................................16

*Tubbs v. Stony Brook Univ.*,
    343 F. Supp. 3d 292 (S.D.N.Y. Oct. 30, 2018) ....................................22

*Univ. of Pa. v. EEOC*,
    493 U.S. 182 (1990) ................................................................................12

*Vengalattore v. Cornell Univ.*,
    36 F. 4th 87 (2d Cir. 2022) .....................................................................11

*Welcome v. N.Y. City Dep't of Educ. (In re Welcome)*,
    2018 U.S. Dist. LEXIS 190716 (E.D.N.Y. Nov. 5, 2018) ....................23

*Wiley v. Plattsburgh*,
    407 F. Supp. 3d 119 (N.D.N.Y. 2019) .............................................17, 18

*Yusuf v. Vassar College*,
    35 F.3d 709 (2d Cir. 1994) ...............................................................11, 17

## **Statutes**

20 U.S.C. § 1681 ...........................................................................................*passim*

42 U.S.C. § 2000e *et seq.* ...............................................................11, 12, 13, 14

## PRELIMINARY STATEMENT

Defendant Ithaca College, sued here as the Trustees of Ithaca College (the "College" or "Ithaca College") submits this Memorandum of Law in support of its Rule 12 motion to dismiss plaintiff's Complaint.

That Complaint presents a threshold procedural deficiency which mandates its dismissal: Plaintiff's employment discrimination claim, asserted under Title IX of the Education Amendments of 1972, is precluded by the rights and remedies available under Title VII of the Civil Rights Act. Plaintiff, having admitted his failure to timely pursue a claim under Title VII, cannot circumvent its mandatory predicates merely because he happens to work in the higher education space. This is especially so here, where plaintiff's claim relates strictly to employment and has nothing whatsoever to do with the College's Title IX policy, procedure, or purpose.

Beyond this dispositive procedural deficit, many of plaintiff's claims are time-barred under Title IX's three-year statute of limitations, and others fail to state a claim given the absence of plausible allegations which even suggest, let alone demonstrate, that his purportedly hostile work environment was motivated by discriminatory animus, that the alleged conduct was severe or pervasive, or that the College acted in a clearly unreasonable manner in response to his reports of alleged misconduct.

For each of these reasons, and others detailed below, plaintiff's Complaint should in all respects be dismissed.

## THE ALLEGATIONS IN PLAINTIFF'S COMPLAINT

While on a Rule 12 motion the well-pleaded facts are deemed true for purposes of analysis, courts are fully entitled to reject implausible or conclusory allegations, or speculative assertions in

a pleading. *See, e.g.*, *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 362 (S.D.N.Y. 2016); *see also* pg. 11, *infra*. Those important propositions all find application on this motion.

Plaintiff is a tenured faculty member at Ithaca College, in the College's School of Music, Theatre, and Dance. Dkt. 1 at ¶ 6. From July 1, 2019 through June 30, 2022, plaintiff served as one of the College's associate provosts for academic affairs. *Id.* at ¶ 7. Prior to this appointment, he claims to have served in several other administrative roles, including "four years as chairperson of the All-College Tenure and Promotion Committee, three years on the Faculty Development Committee and three terms on the Academic Policies Committee." *Id.* at ¶ 9. Plaintiff was appointed to the rank of professor in May 2020 (*id.*) and continued in that role after his term as an associate provost ended on June 30, 2022 (*id.* at ¶ 64).

Plaintiff claims he "identifies as a homosexual," and has "been subjected to unlawful sexual harassment" at the College "dating back to 2021." Dkt. 1 at ¶ 10; *see also id.* at ¶ 37. He claims the alleged harassment created a "hostile" work environment, that the College was deliberately indifferent to his reports of the alleged harassment, and that he was retaliated against for reporting the alleged harassment to College officials. *Id.* at ¶ 10; *see also id.* at ¶ 37. It is helpful, in parsing the particulars of plaintiff's assertions, to focus on the dates of these allegedly discriminatory acts and omissions, in juxtaposition the April 30, 2025 filing date of his Complaint.

### March 2019 to December 2021

Plaintiff alleges that he "commenced his duties" as associate provost on July 1, 2019. Dkt. 1 at ¶ 39. Two-thirds of the way through plaintiff's appointment, in July 2021, his supervisor at the time (College Provost La Jerne Terry Cornish), was appointed the College's interim president. *Id.* at ¶¶ 14, 43. As a result of this appointment, in July 2021 Dr. Melanie Stein assumed the position of Provost, and became plaintiff's new supervisor. *Id.* at ¶¶ 16, 43.

2

Plaintiff claims Dr. Stein "evinced a management style quite different than that of Dr. Cornish, who had a 'hands-off' approach as [a] supervisor." Dkt. 1 at ¶ 44. In September 2021, plaintiff sensed that Dr. Stein "had a different supervisory approach in relation to his work" as opposed to the work of two other associate provosts, "who were heterosexual." *Id.* at ¶ 45. He claims Dr. Stein "often rais[ed] her voice in anger or frustration if [he] tried to explain a college policy she didn't like or comprehend," and that she micromanaged his assigned tasks. *Id.* Plaintiff further claims that Dr. Stein changed the remote work policy that was in place during Dr. Cornish's time as Provost, and that Dr. Stein required him to seek permission before working remotely, while neither of the other two associate provosts needed advanced permission to work remotely. *Id.* at ¶ 46.

Plaintiff claims that by December 2021, he "realized Dr. Stein did not want him on her team as an associate provost…because of [his] sexual orientation as a gay man." Dkt. 1 at ¶ 47. Around this time, plaintiff claims that Dr. Stein "interrupted" him at "at various meetings." *Id.* at ¶ 49. He also claims that in conversations about his role and "the campus climate," plaintiff told Dr. Stein that "he thought he was treated differently and in a more judgmental manner because of his sexual orientation as a gay man," to which Dr. Stein "exclaim[ed]" he was "too sensitive," "too thin skinned," "too dramatic," and needed to be "tougher." *Id.* at ¶¶ 50-51. Plaintiff speculates that these are code phrases for "[y]ou are too gay," *id.* at ¶ 50, although none of those terms mention, or are indicative of, sexual orientation.

During one specific conversation in December 2021, plaintiff alleged that Dr. Stein "imitate[ed] [him] in exaggerated gestures and volume," by raising the pitch of her voice, moving her body in a frantic manner, and waving her hands about her head "in limp-wristed fashion." Dkt. 1 at ¶ 52. Following this occurrence, plaintiff claims he reported "Dr. Stein's homophobic

impression to Dr. Cornish, Dean Claire Gleitman of the College's School of Humanities and Sciences, and Associate Vice President for Human Resources Kirra Franzese. *Id.* at ¶ 53. Plaintiff acknowledges Dr. Cornish met with Dr. Stein, but claims that Dr. Stein "disingenuously" told Dr. Cornish that plaintiff was creating dysfunction in the Provost's office, in an "effort to deflect" from her own behavior. *Id.* at ¶ 53.

Shortly before the end of December 2021, a Dean's position opened in the School of Music, Theatre and Dance, for which plaintiff claims he "was highly qualified and nominated for." Dkt. 1 at ¶ 54. However, plaintiff alleges Dr. Stein told him that while he could apply for that position, he would not be awarded an interview because "she needed someone in that role who was 'stronger' and 'less thin-skinned.'" *Id.*

### January 2022 to July 2022

At an unidentified date in the winter or early spring of 2022, during a meeting with Dr. Cornish to discuss plaintiff's "career goals," she "broached the topic of plaintiff's alleged dysfunctional behavior." Dkt. 1 at ¶ 55. Plaintiff claims that he responded by "recit[ing] the homophobic behaviors he was subjected to by Dr. Stein," but asserts that Dr. Cornish "curtly remarked" that Dr. Stein had not been accused of such behavior before. *Id.* Plaintiff alleges that Dr. Cornish failed to intervene in the situation, and instead "placed responsibility for ending this behavior solely on plaintiff," advising him to "use certain language" to address his perceived sexual discrimination by Dr. Stein. *Id.* at ¶ 56.

Plaintiff further alleges that because Dr. Cornish failed to assist him, he contacted Ms. Franzese and reported Dr. Stein's continued sexual harassment. Dkt. 1 at ¶ 57. He claims Ms. Franzese "acknowledged the interpersonal problems plaintiff was having with Dr. Stein," but "determined there were no actionable violations of [the College's] policies," and therefore told

him no action would be taken. *Id.* at ¶ 58. "Notwithstanding her initial conclusion, and in an apparent attempt to informally resolve plaintiff's claims of sexual discrimination," plaintiff claims Ms. Franzese attended one of the regularly scheduled meetings he had with Dr. Stein. *Id.* at ¶ 59. During that meeting, plaintiff claims that he "related the instances of sexual discrimination and bullying" he had experienced, and in response Dr. Stein allegedly "announced that 'she was so angry right now,'" which caused the meeting to conclude "abruptly." *Id.*

Following this meeting, Dr. Stein allegedly "offered plaintiff 'professional coaching' with an outside consultant" to improve his relationships with co-workers and otherwise help him manage professional disagreements. Dkt. 1 at ¶ 61. Plaintiff rejected this offer "as mere 'window dressing' and an exercise in futility." *Id.* at ¶ 62. Following plaintiff's rejection of the professional coaching support that had been offered, at an unspecified time thereafter Dr. Stein "advised plaintiff that she was not contemplating a renewal of his associate provost position for a second, three-year term." *Id.* at ¶ 63. Plaintiff alleged Dr. Stein ultimately "hired a straight while male" to replace him in that role. *Id.*

After his non-renewal as an associate provost, plaintiff returned to the College's teaching faculty in the School of Music, Theatre and Dance on July 1, 2022. Dkt. 1 at ¶ 64. He asserts this was a "demotion," came with a cut in salary and constituted a "black mark on his resume." *Id.* at ¶¶ 64-65.

***August 2022 to June 2023***

Sometime before the end of July 2022, Dr. Stein offered plaintiff the opportunity for sabbatical leave for the fall 2022 semester. Dkt. 1 at ¶ 65. Plaintiff accepted the offer and while he was on sabbatical, Dr. Stein purportedly reported "negatively" about him to Ann Hogan, the newly

appointed Dean of the School of Music, Theatre and Dance. *Id.* at ¶¶ 66-67. Plaintiff does not articulate the nature or content of the allegedly "negative" reports.

When he returned from sabbatical, in the spring 2023 semester, plaintiff alleges the "discrimination against" him continued. Dkt. 1 at ¶ 68. As examples of this purported "discrimination," plaintiff alleges his name was omitted from the programs for certain choral concerts. *Id.* He claims to have learned of this omission from students, and claims that he told Dean Hogan of the omission. *Id.* at ¶¶ 68-69. Tellingly, he then claims that Dr. Sean Linfors, a colleague on the Music faculty, contacted him and stated the omission was "entirely inadvertent," and attributable to a "cut and paste" of an earlier program template. *Id.* at ¶ 69.

Plaintiff claims that when this omission occurred, he "was on the teaching faculty for the fall semester of 2022 (albeit on sabbatical leave)," but a heterosexual faculty member, Dr. Jennifer Kay, was also on sabbatical and was listed in the programs. Dkt. 1 at ¶¶ 68, 70. However, plaintiff admits that at this point he had been on a "three-year hiatus," *id.* at ¶ 68, and he makes no similar assertion with respect to Dr. Kay. Additionally, plaintiff alleges that when he reported the omission to the dean, "the archival programs for the spring 2023 concerts were altered to cover up this 'mistake.'" *Id.* at ¶ 71. He does not acknowledge the likelihood that, in response to his expressed concerns, those archival programs instead were updated to address those concerns and acknowledge his status as an active faculty member.

Other instances of alleged "discrimination" identified by plaintiff are equally speculative and implausible. These include:

- Plaintiff's name was not shown beside the students he recruited to the School of Music, Theatre, and Dance in the faculty contact column of the "smart sheet," until he "requested that this 'oversight' be corrected." Dkt. 1 at ¶ 72.

- Plaintiff's "recommendations on pre-screened candidates [for admission] were routinely overturned in favor of straight faculty's recommendations." *Id.* at ¶ 73.

- Plaintiff was "constantly interrupted" in faculty meetings while "other faculty" were allowed to speak. *Id.* at ¶ 74.

- Plaintiff was "remonstrated if he interjected his opinions on matters under discussion" during lively interactions among faculty members. *Id.*

- Meetings were "scheduled in accord with the itineraries of straight colleagues so that plaintiff was often forced to attend meetings via [the] Zoom platform in order to participate. *Id.*

Plaintiff claims that at some point he met with Dean Hogan, and "was asked to list the homophobic microaggressions he was experiencing during the spring 2023 semester." Dkt. 1 at ¶ 75. He claims he was not given advance notice this request was going to be made, and had to "relive very triggering experiences" when he recounted the alleged incidents of "harassment." *Id.* Plaintiff alleges that Dean Hogan commented that he was "wrong to perceive homophobia in [the] conduct" he described. *Id.*

At an unspecified point during "this time frame," the College established a committee, to which plaintiff was an original appointee, "named the Faculty Advisory Group (FAG)." *Id.* at ¶¶ 77-78. Allegedly it is "common on campus for committees to become known by their acronyms" and at meetings, various members employed "the acronym FAG." *Id.* at ¶¶ 77-78. Plaintiff claims no one "noticed the acronym until [he] pointed it out" and that when he did so, "certain members and the Dean agreed that the committee should not be referred to by its acronym." *Id.* at ¶¶ 77, 79. Despite this acknowledgement, plaintiff claims "various straight members of the committee continued to employ that term." *Id.* at ¶ 79. The process to change the name of the committee required formal discussion, during which plaintiff was asked to explain the need for the change,

and during which plaintiff alleges the acronym was repeatedly brought up in his presence with the intent of offending him. *Id.* at ¶¶ 80-81.

Later, in the fall of 2023, plaintiff was a member, and later headed, a search committee looking to fill a new tenure track position in the Department of Music Performance. Dkt. 1 at ¶¶ 83-84. The finalists were identified by mid-December 2023, and while there were several internal candidates, none were chosen as finalists. *Id.* In his capacity as head of the committee, plaintiff was asked by Dean Hogan and Dr. Deborah Martin, Professor of Music Performance, to justify the finalist candidates, and specifically was asked why internal candidates were not finalists. *Id.* at ¶ 87. Plaintiff claims this inquiry was discriminatory because "the gay member of the search committee, not the other straight members…was the one called upon to justify the finalist list." *Id.* Plaintiff speculates that Dr. Martin was "target[ing]" him as a "member of a marginalized group." Although plaintiff alleges Dean Hogan and Associate Dean Luis Lubriel met with Dr. Martin (*id.* at ¶¶ 88-89), their purported "inaction" "contributed to the toxic anti-gay environment" because they did not take "definitive corrective action." *Id.* at ¶ 91.

### January 2024 to March 2025

Plaintiff alleges that another "example of discriminatory treatment" occurred at "the beginning of the spring 2024 semester when he was summoned by Dean Hogan and coerced into teaching a course for which he had no prior notice, experience, or time to prepare for." Dkt. 1 at ¶ 92. Dean Hogan allegedly told plaintiff that teaching the course would "alleviate some of the ill-will exhibited against him by certain faculty in the school, arising from his alleged actions while sitting as replacement chair of the faculty search committee." *Id.* at ¶ 93. Plaintiff claims "no other straight faculty member was coerced into teaching a course for which he/she had no prior curriculum experience." *Id.* at ¶ 94. Plaintiff further asserts that he contacted Ms. Franzese via

email in May 2024 regarding his allegations of discrimination and harassment, but she did not respond for 12 days. *Id.* at ¶ 95.

Sometime in 2024, plaintiff also submitted his Annual Faculty Activity Report for 2023, and wrote that he was "having a hard time surviving the toxic hetero-normative and anti-gay atmosphere at Ithaca College." Dkt. 1 at ¶ 97. The Dean responded to plaintiff's submission by encouraging plaintiff to reach out to others for support and to consider the resources available at the College. *Id.* Plaintiff claims that he took the Dean's suggestion and contacted Title IX Coordinator Linda Koenig. *Id.* at ¶ 98. During that discussion, plaintiff claims he related the sexual harassment he believed he had "suffered," and he provided a written narrative on April 2, 2024. *Id.*

Plaintiff claims that Ms. Koenig "stated that while she could take action, it wouldn't result in anything significant because of the individuals involved." Dkt. 1 at ¶ 99. She suggested a non-Title IX avenue to pursue, which plaintiff claims was "unavailable because of expiration of the applicable statute of limitations." *Id.* at ¶ 99.

Around this time, plaintiff also claims he "discovered that a number of recorded auditions of prospective applicants to the School of Music, Theatre and Dance had not been fully processed." *Id.* at ¶ 100. He proposed evaluating the unreviewed auditions himself as a second evaluator, or as a sole evaluator. *Id.* at ¶ 101. In response the Associate Dean allegedly replied that every application required a second faculty evaluator; thus, plaintiff continued to evaluate the auditions with another faculty member. *Id.* at ¶ 102. Plaintiff claims he later learned that "another heterosexual colleague of his in the School of Music, Theatre and Dance (with lesser years of teaching and faculty experience) had been permitted to be a sole evaluator on a number" of the applications. *Id.* at ¶ 103. Plaintiff claims the College "required the second opinion of a straight

colleague in order for an application of a prospective enrollee to be processed by plaintiff, but this same requirement was not imposed on his heterosexual colleagues." *Id.* at ¶ 105.

Sometime in 2025, plaintiff submitted his Annual Faculty Activity Report for 2024. *Id.* at ¶ 106. Therein he posited that as "a member of the LGBTQIA+ community" he "ha[s] to deliver at a level that far exceeds expectations in order to be valued." *Id.* at ¶ 106. He further contended he faced "discrimination" "daily" and worked in a "toxic environment." *Id.* at ¶ 106. At the end of April 2025, plaintiff filed his Complaint, which the College now moves to dismiss.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must 'nudge' claims 'across the line from conceivable to plausible.'" *Nungesser*, 169 F. Supp. 3d at 362 (quoting *Twombly*, 550 U.S. at 570). "Legal conclusions, unlike facts, are not entitled to an assumption of truth." *Id.* Thus, a "complaint that offers 'labels and conclusions' or 'naked assertions' without 'further factual enhancement' will not survive a motion to dismiss." *Id.* (quoting *Iqbal*, 556 U.S. at 679).

Although the lapse of a limitations period is an affirmative defense that a defendant ordinarily must plead and prove, "a defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 426 (2d Cir. 2008); *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160,

162 (2d Cir. 1989) ("where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss. Such a motion is properly treated as a Rule 12(b)(6) motion to dismiss").

I.    **THE RIGHTS AND REMEDIES UNDER TITLE VII PRECLUDE CLAIMS FOR EMPLOYMENT DISCRIMINATION UNDER TITLE IX**

Title IX provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX was passed in 1972 as part of a series of amendments to the Civil Rights Act of 1964 and other antidiscrimination statutes, extending protections against discrimination in federally funded programs to address sex discrimination in educational institutions, and thereby ensure equal access to educational opportunities. *See generally Yusuf v. Vassar College*, 35 F.3d 709, 714 (2d Cir. 1994). "Congress authorized an administrative enforcement scheme for Title IX." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 638 (1999). "Federal departments or agencies with the authority to provide financial assistance are entrusted to promulgate rules, regulations, and orders to enforce the objectives of [Title IX] and these departments or agencies may rely on any means authorized by law, including the termination of funding, to give effect to the statute's restrictions." *Id.*

According to the Second Circuit, "[i]t is now well settled that, while Title IX does not itself provide for a private cause of action to enforce its requirements, a private right of action is implied in a variety of circumstances." *Vengalattore v. Cornell Univ.*, 36 F. 4th 87, 104 (2d Cir. 2022). In *Vengalattore*, a male faculty member sued Cornell, alleging that its discipline of him under its Title IX policies and procedures, in response to a female student's allegations that he had an inappropriate relationship with her, amounted to discrimination on the basis of gender in violation

11

of Title IX. *See generally id.* at 92. In evaluating the faculty member's claim, the Second Circuit held that "Title IX allows a private right of action for a university's intentional gender-based discrimination against a faculty member." *Id.* at 106. However, the Court's analysis focused on whether the process and outcome of Cornell's Title IX investigation, and the resulting disciplinary proceeding, was infected by bias on the basis of gender. *Id.* at 106-09.

The Second Circuit did not directly opine on whether Title VII's applicability to employment discrimination claims bars an employee's private cause of action under Title IX when that Title IX claim seeks relief unrelated to an allegedly faulty or biased Title IX process. Had the Second Circuit considered the question whether Title VII precludes Title IX claims in such a scenario, that answer would be in the affirmative.

Title VII provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer…to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII's prohibition against employment discrimination was extended to federal employees and educational institutions by the Equal Employment Opportunity Act of 1972. *See Univ. of Pa. v. EEOC*, 493 U.S. 182, 189-90 (1990). The purpose of this 1972 amendment was to combat "the widespread and compelling problem of invidious discrimination in educational institutions." *Id.* at 190.

Thus, Title VII promulgates a "broad rule of workplace equality." *Harris v. Forklift Sys.*, 510 U.S. 17, 22 (1993). Title VII accomplishes its goal via an administrative process that requires claimants first to file a timely charge of employment discrimination with the Equal Employment Opportunity Commission, and then obtain a right to sue letter from the Commission before filing a complaint in a federal court. 42 U.S.C. §§ 2000e-4-2000e-5.

Title VII and Title IX work in tandem, and there is no indication in this legislative scheme that Congress intended Title VII and Title IX to overlap. "In the light of the complexity of Title VII's express remedial scheme, it would be anomalous to conclude that the implied right of action under Title IX would allow employees of educational institutions immediate access to judicial remedies unburdened by any administrative procedures." *Joseph v. Bd. of Regents of the Univ. Sys. of Ga.*, 121 F.4th 855, 869 (11th Cir. 2024). Moreover, that Congress expressly decided to extend Title VII's remedies to employees of educational institutions only three months before enacting Title IX reaffirms the conclusion that there was no congressional intent that Title VII and Title IX overlap. *See Lakoski v. James*, 66 F.3d 751, 756 (5th Cir. 1995) ("Congress enacted Title IX only months after extending Title VII…[, t]hat Congress intended to create a bypass of Title VII's administrative procedures so soon after its extension…is an extraordinary proposition[,] Title IX's similarity to Title VII belies the contention.").

Thus, the Second Circuit's decision in *Vengalattore*, holding that Title IX provides a private right of action for an educational institution's intentional gender-based discrimination against an employee, should be read to conclude that "such discrimination must occur in the context of a disciplinary proceeding." *See Barnes v. Rochester City Sch. Dist.*, 2024 U.S. Dist. LEXIS 230960, at *32 (W.D.N.Y. Dec. 20, 2024). In cases where a plaintiff asks a court to "circumvent the procedural requirements of Title VII simply because the employer is an educational institution receiving federal funds," the court should decline to do so because "[t]here is not evidence that Congress intended this result." *See id.* at *33; *Lakoski*, 66 F.3d at 758 ("We are not persuaded that Congress offered Title IX to employees of federally funded educational institutions so as to provide a bypass to Title VII's administrative procedures.").

13

Yet that is exactly what plaintiff is asking this Court to do here. Plaintiff's claim is one for pure and unvarnished employment discrimination, and related workplace hostility. Unlike the plaintiff in *Vengalattore*, plaintiff's claim for discrimination here has not arisen in the context of a disciplinary proceeding under Title IX; indeed, no Title IX proceedings were convened, and no Title IX investigation occurred. The singular reason plaintiff did not pursue his claim under Title VII is answered by the result-oriented allegations in his own Complaint: "a non-Title IX avenue" was "unavailable" to him "because of expiration of the statute of limitations." Dkt. 1 at ¶ 99.

Plaintiff's claim for employment discrimination under Title IX is a blatant effort to end run the procedural requirements of Title VII, and that end run should be closed off by this Court.

## II.    SEVERAL OF THE ALLEGED DISCRIMINATORY AND RETALIATORY ACTS ARE NONACTIONABLE

Beyond this threshold deficiency, the bulk of the acts plaintiff complains of are time-barred. The statute of limitations for Title IX claims brought in New York is three years. *Curto v. Edmundsom*, 392 F.3d 502, 504 (2d Cir. 2004). Plaintiff filed his complaint on April 30, 2025. *See generally* Dkt 1. Thus, acts or omissions occurring prior to April 30, 2022 are nonactionable. These include, at a minimum, the following[1]:

- Dr. Stein's purported prioritization and micromanagement of plaintiff's assigned tasks (Dkt 1. at ¶ 45);

- The requirement that plaintiff seek permission before working remotely (*id.* at ¶ 46);

- Dr. Stein's alleged interruption of plaintiff at "various meetings" (*id.* at ¶ 49);

- Dr. Stein's comments that plaintiff was "too sensitive," "too thin skinned," "too dramatic," and needed to be "tougher" (*id.* at ¶¶ 50-51, 54);

---

[1] Separate and apart from their untimeliness, the College notes that none of these acts or omissions constitute actionable discrimination, harassment or retaliation.

- Dr. Stein's allegedly "exaggerated" imitation of plaintiff (*id.* at ¶ 52);

- Plaintiff's alleged report of Dr. Stein's "homophobic impression" of plaintiff to College officials (*id.* at ¶ 53);

- Dr. Cornish's alleged failure to "curtail Dr. Stein's sexual harassment of plaintiff" (*id.* at ¶¶ 55-56); and

- Dr. Stein's alleged "blocking [of] plaintiff's candidacy for appointment as dean within the School of Music, Theatre and Dance, by her refusal to allow plaintiff an interview for that position" (*id.* at ¶¶ 54, 125).

These acts, among others, fall outside the applicable limitations period, and therefore are not actionable.

**III.    PLAINTIFF'S TITLE IX CLAIM FAILS BECAUSE HE PLEADS NO FACTS SUPPORTING AN INFERENCE OF DISCRIMINATORY ANIMUS, SEVERE OR PERVASIVE CONDUCT, OR DELIBERATE INDIFFERENCE**

"Title IX permits a plaintiff to recover damages when he or she is subjected to a hostile environment that constitutes discrimination on the basis of sex and deprives the plaintiff of the ability to enjoy the benefits of an educational program receiving federal funds." *Roe v. St. John's Univ.*, 91 F.4th 643, 661 (2d Cir. 2024); *accord Maria v. Mass Inst. of Tech.*, 2024 U.S. Dist. LEXIS 176972, at *23-24 (S.D.N.Y. Sept. 30, 2024) (Title IX "indirectly prohibits sexual harassment on the basis that harassment can be a form of sex discrimination when it leads to a hostile environment, which then impedes one's access to the benefits of an educational program"). Title IX affords relief only where the underlying conduct is intentional; inadvertent omissions are not actionable. *See Pungitore v. Barbera*, 506 F. App'x 40, 42 (2d Cir. 2012).

In addition, "[t]o establish a hostile environment, a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and that the conduct is connected to an employee's protected characteristic." *Doe v.*

*Syracuse Univ.*, 2023 U.S. App. LEXIS 29741, at *7 (2d Cir. Nov. 8, 2023) (quotation omitted). A school "is liable for a hostile environment under Title IX if it provides no response or if it provides a response that amounts to deliberate indifference to discrimination." *Id.* (quotation omitted).

Here, plaintiff alleges various acts by College faculty, staff, and administrators that he claims created a hostile environment (dkt. 1 at ¶¶ 114-117), and claims in conclusory fashion that the College acted with deliberate indifference in response (*id.* at ¶¶ 120-22). His Title IX claims fail for at least three reasons: (1) he does not allege nonconclusory facts supporting an inference that the alleged conduct underlying his hostile work environment claim was motivated by discriminatory animus; (2) he does not plead severe or pervasive conduct; and (3) he fails to allege the College's response to his alleged reports of harassment was deliberately indifferent or clearly unreasonable.

### A. PLAINTIFF FAILS TO PLEAD FACTS SUPPORTING AN INFERENCE OF DISCRIMINATORY ANIMUS

As noted, the alleged discriminatory acts and/or harassment underlying a Title IX hostile environment claim must be "on the basis of sex." 20 U.S.C. § 1681(a); *see also Doe v. State Univ. of N.Y. Purchase Coll.*, 2024 U.S. Dist. LEXIS 171440, at *16 (S.D.N.Y. Sept. 23, 2024) ("[t]he harassment underlying a Title IX hostile environment complaint must also, of course, be gender-oriented") (quotation omitted). Thus, the "hostility" of the work environment "must be borne of animus toward the plaintiff as a result of his membership in a protected class." *Acosta v. City of New York*, 2012 U.S. Dist. LEXIS 60460, at *20 (S.D.N.Y. Apr. 26, 2012); *see also Doe v. Syracuse Univ.*, 2023 U.S. App. LEXIS 29741, at *7 (conduct must be "connected to an employee's protected characteristic"); *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015) ("[i]t is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic").

16

With respect to this "element of discriminatory intent," a plaintiff must "plead[] specific facts that support a minimal plausible inference of such discrimination." *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016). While an "inference of discrimination can arise from circumstances including, but not limited to…the more favorable treatment of employees not in the protected group" (*Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015)), a plaintiff alleging "gender discrimination by a university must do more than recite conclusory assertions" (*Yusuf*, 35 F.3d at 713). Alternatively stated, a plaintiff must make "specific allegations" that "support a minimal inference of gender discrimination." *Wiley v. Plattsburgh*, 407 F. Supp. 3d 119, 130 (N.D.N.Y. 2019); *see also Pungitore*, 506 F. App'x at 42 (a plaintiff "must plead facts supporting a plausible inference that gender bias was a motivating factor").

Here, plaintiff utterly fails to connect the alleged discriminatory conduct underlying his hostile environment claim to his sexual orientation as a gay man. On several occasions plaintiff attempts to manufacture an inference of discrimination based on the more favorable treatment of his "straight" colleagues; for example, by alleging that: (1) Dr. Stein purportedly supervised him differently from this heterosexual colleagues (dkt. 1 at ¶ 45); (2) he purportedly was required to seek permission to work remotely while no such requirement was imposed on his heterosexual colleagues (*id.* at ¶ 46);[2] (3) his "recommendations on pre-screened candidates [for admission] were routinely overturned in favor of straight faculty's recommendations" (*id.* at ¶ 73); (4) he was "constantly interrupted" in faculty meetings while "other faculty" were allowed to speak (*id.* at ¶ 74); (5) meetings were "scheduled in accord with the itineraries of straight colleagues" (*id.* at ¶ 74); (6) the straight members of the faculty search committee were not asked to justify the finalist

---

[2] Allegations (1) and (2) are time-barred, *see* Point II, at pgs. 15-16, *supra*, but for the reasons herein, they also fail substantively.

candidates (*id.* at ¶ 87); (7) he was "coerced" into teaching an additional course while "no other straight faculty member was coerced into teaching a course" (*id.* at ¶¶ 93-94); and (8) "another heterosexual colleague . . . [was] permitted to be a sole evaluator on a number" of applications while his evaluation "required the second opinion of a straight colleague" (*id.* at ¶¶ 100-05).

None of these allegations, however, are linked to plaintiff's sexuality, or supported by nonconclusory averments plausibly linking plaintiff's sexuality to allegedly "adverse" treatment. *See, e.g.*, *Pungitore*, 506 F. App'x at 43 n.1 (declining to "afford" allegations that "less qualified male students" received different treatment "the presumption of truth" "given the lack of any alleged facts supporting th[e] conclusory assertion"); *Annabi v. New York Univ.*, 2024 U.S. Dist. LEXIS 169857, at *19-22 (S.D.N.Y. Sept. 20, 2024), *aff'd* 2025 U.S. Dist. LEXIS 8324 (2d Cir. Apr. 9, 2025) (finding plaintiff was "unable to allege disparate treatment because he d[id] not show that he was similarly situated to the individuals of a different race, national origin or gender selected in his stead"); *Wiley*, 407 F. Supp. 3d at 129 (finding plaintiff's "allegation that Caucasian employees charged with sexual misconduct were allowed to continue teaching pending an investigation, [was] a naked assertion devoid of further factual enhancement") (quotations omitted).

Moreover, much of what plaintiff alleges as "discriminatory" conduct is attributable not to his sexuality, but to legitimate, nondiscriminatory differences in circumstance that plaintiff himself pleads. For example, while plaintiff alleges the omission of his name from the choral programs was discriminatory, he also alleges it was due to a "cut and paste" of a program from an earlier year during which he was on a three-year hiatus from teaching. *See* Dkt. 1 at ¶¶ 68-70. Additionally, plaintiff alleges that he was targeted as the "gay member" of the faculty search committee to justify the finalist selections, but expressly claims he headed that committee, and therefore would be the

logical person to whom questions as to its choices and actions would be directed. *See id.* at ¶¶ 83-88. And, although plaintiff alleges he was "coerced" into teaching a course for which he had no time to prepare because he was gay, he also alleges Dean Hogan suggested he teach the course to establish goodwill with his colleagues after the search committee that he headed did not choose to advance any of them for the tenure track slot. *See* Dkt. 1 at ¶¶ 96-94.

With respect to plaintiff's remaining allegations, the conduct he claims to be actionable is either: (1) unaccompanied by any act, utterance, or allegation that even suggests discriminatory animus on the basis of sexual orientation (*see, e.g.*, Dkt. 1 at ¶¶ 49, 66-67, 72, 74); or (2) is accompanied only by plaintiff's pure speculation as to such motivation, which is patently insufficient to move his allegations "across the line," from conceivable to plausible. For example, while plaintiff speculates Dr. Stein's alleged remarks that plaintiff was "too sensitive" or "too thin skinned" are code phrases for "too gay" (*id.* at ¶ 50), none of those terms are indicative of sexual orientation.[3] As another example, while plaintiff alleges the use of the acronym "FAG" was "painful and humiliating" for him, he does not allege he was ever called the derogatory term and he only conclusorily alleges that the acronym was used with the "intent" of offending him after he pointed out to other members that it was offensive (who, as plaintiff alleges, did not "notice" the acronym). *Id.* at ¶¶ 77-82. Mitigating this alleged conduct is also the fact that the name of the committee was readily changed when plaintiff voiced his concern. *Id.* at ¶ 81. All in all, plaintiff does not plead facts supporting an inference of discrimination on the basis of his sexual orientation. *See Pungitore*, 506 F. App'x at 43 ("[A]s Iqbal and Twombly make clear, a mere possibility is insufficient to state a plausible claim for relief."); *see, e.g., Flemming v. MaxMara USA, Inc.*, 371

---

[3] The allegations regarding Dr. Stein's remarks are time-barred, *see* Point II, at pgs. 15-16, *supra*, but for the reasons herein, they also fail substantively.

F. App'x 115, 118-19 (2d Cir. 2010) (plaintiff did "not allege any fact to connect [the alleged racially harassing comment] to her other allegations of unfair treatment, which [we]re not facially related to her race"); *Annabi*, 2024 U.S. Dist. LEXIS 169857, at *19-20 (plaintiff did "not allege [d]efendant made any remarks to [p]laintiff that could indicate discriminatory animus" and did not allege any conduct was "accompanied by any statement denigrating individuals" of the protected class); *Doe v. Torrington Bd. of Educ.*, 179 F. Supp. 3d 179, 197 (D. Conn. 2016) ("Doe does not sufficiently allege that he was bullied, harassed, and assaulted because of his gender. . . .The terms "fat ass' and 'baby,' are not associated with gender, and other courts in this Circuit have found that the terms 'pussy,' 'faggot,' and 'bitch' are also insufficient to suggest that a student was harassed on the basis of gender.").

### B.    PLAINTIFF FAILS TO PLEAD SEVERE OR PERVASIVE CONDUCT

Even if plaintiff had pled the alleged harassment was motivated by discriminatory intent, he has failed to plead facts sufficient to establish that the alleged harassment was sufficiently severe or pervasive to alter the conditions of his employment. *Littlejohn*, 795 F.3d at 320-21. The significance of the harassment is determined by considering the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating rather than merely offensive, whether it interfered with plaintiff's work, and what psychological harm, if any, resulted. *Alford v. Guise*, 2025 U.S. Dist. LEXIS 69896, at *15-16 (W.D.N.Y. Apr. 11, 2025). "An environment is considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." *LaSalle v. City of New York*, 2015 U.S. Dist. LEXIS 41163, at *20 (S.D.N.Y. Mar. 30, 2015).

Here, plaintiff alleges a handful of minor incidents by various actors that occurred over a four-year span. None of the acts complained of were physically threatening and, little if any could

plausibly be classified as offensive. While Dr. Stein's alleged conduct and remarks[4] could certainly be deemed rude, the use of the "FAG" acronym could be deemed insensitive, and the other incidents could be deemed a diminishment of plaintiff's role and responsibilities, none of it is sufficient to support a hostile environment claim under Title IX. *See, e.g., Flemming*, 371 F. App'x at 118-19 (finding allegations that "defendants wrongly excluded [plaintiff] from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her" insufficient to "support a finding of a hostile work environment that is pervasive or severe"); *Davis-Molinia v. Port Auth. of N.Y. & N.J.*, 2011 U.S. Dist. LEXIS 93868, at *43-44 (S.D.N.Y. Aug. 19, 2011) (allegations of "diminished [job] responsibilities," "exclu[sion] from staff meetings," deliberate "avoid[ance]," "certain" looks, always being "questioned," "yell[ing] and talk[ing] down to," and an increased workload of menial tasks, among other factors, were not enough to show that defendants' conduct was sufficiently severe or pervasive).

### C.    PLAINTIFF ALSO FAILS TO PLAUSIBLY PLEAD DELIBERATE INDIFFERENCE

"Recipients of federal funds 'are properly held liable in damages under Title IX only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.'" *Doe v. Syracuse Univ.*, 2023 U.S. App. LEXIS 29741, at *2 (quoting *Davis*, 526 U.S. at 650). Deliberate indifference is found only "when a defendant's 'response to known discrimination is clearly unreasonable in light of the known circumstances.'" *Id.* at *2-3 (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 751 (2d

---

[4] This argument is advanced to the extent those comments are not time-barred and are otherwise actionable.

Cir. 2003)). This stringent standard essentially "requires recklessness." *Tubbs v. Stony Brook Univ.*, 343 F. Supp. 3d 292, 309-10 (S.D.N.Y. Oct. 30, 2018).

Moreover, under Title IX schools are "not obligated to undertake any particular type of investigation in any particular manner." *KF v. Monroe Woodbury Cent. Sch. Dist.*, 2012 U.S. Dist. LEXIS 60341, at *22 (S.D.N.Y. Apr. 30, 2012). A school is "simply required to respond in a fashion that [i]s not clearly unreasonable in light of the known circumstances." *Id.* The Supreme Court has expressly rejected the proposition that any particular corrective action is required when responding to incidents of alleged harassment. *Davis*, 526 U.S. at 648 (rejecting contention that a school "must immediately suspend or expel a student accused of sexual harassment").

Here, plaintiff has effectively pleaded himself out of a deliberate indifference claim, because his allegations are that the College responded to his reports of alleged sexual harassment, but did not respond in the manner he would have preferred. For example, plaintiff acknowledges Dr. Cornish and Ms. Franzese met with him and Dr. Stein in response to his purported concerns, and that Ms. Franzese ultimately "determined there were no actionable violations of [the College's] policies." Dkt. 1 at ¶¶ 53, 55-56, 58-59. Plaintiff's dissatisfaction with that conclusion, or the determination that no remedial action was warranted given the absence of any policy violation, does not constitute "inaction" amounting to deliberate indifference. *See* Dkt. 1 at ¶ 122. Similarly, plaintiff acknowledges he met with Dean Hogan and others about concerns he had raised about Dr. Martin, and the manner she had challenged the decisions of plaintiff's hiring committee; the fact that those officials disagreed with his complaint about Dr. Martin does not support his assertion of "inaction" amounting to deliberate indifference. *See* Dkt. 1 at ¶¶ 75, 88-89, 122. And in response to plaintiff's contention his Annual Faculty Activity Report for 2023 that in his opinion the climate at the College was "anti-gay," the Dean's response suggesting that he access resources available at

the College to address his concerns, and plaintiff's purported dissatisfaction with the ultimate

decision of the Title IX Coordinator, does not constitute "inaction" on the part of the Dean, the

Title IX Coordinator, or anyone else. Dkt. 1 at ¶¶ 97-99, 122.

In each instance, plaintiff alleges nothing remotely close to indifference. He instead alleges

his dissatisfaction with outcomes. But, Title IX does not assure any particular outcome, and for

this separate reason plaintiff's Title IX claims here fail. *See, e.g.*, *Doe v. Trs. of Columbia Univ.*,

2022 U.S. Dist. LEXIS 153239, at *39-41 (S.D.N.Y. Aug. 25, 2022) ("a mere preference for

different procedures or, indeed, dissatisfaction or disagreement with the procedures used is

insufficient to state a claim for deliberate indifference"); *Welcome v. N.Y. City Dep't of Educ. (In

re Welcome)*, 2018 U.S. Dist. LEXIS 190716, at *22 (E.D.N.Y. Nov. 5, 2018) ("Title IX's

associated jurisprudence does not impose liability under a negligence standard"); *Soriano v. Bd. of

Educ.*, 2004 U.S. Dist. LEXIS 21529, at *17 (E.D.N.Y. Oct. 27, 2004) ("[w]hile [p]laintiffs may

have preferred a different response from the school administrators, the standard is not whether the

administrators responded in a particular manner, but whether their response was clearly

unreasonable in light of all the know circumstances").

## IV.    PLAINTIFF CANNOT RECOVER EMOTIONAL DISTRESS DAMAGES UNDER TITLE IX

Beyond the procedural and substantive deficiencies identified above, plaintiff in his

Complaint seeks damages for "mental and physical pain and suffering." Dkt. 1 at pg. 37. The

Supreme Court, however, has expressly held that compensatory emotional damages are not

recoverable in private actions to enforce anti-discrimination statutes, such as Title IX. *Cummings

v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 229-30 (2022); *accord*, *Gordon Niagara

Wheatfield Cent. Sch. Dist.*, 2023 U.S. Dist. LEXIS 147735, at *16-21 (W.D.N.Y. Aug. 21, 2023).

Accordingly, in the highly unlikely event that any of plaintiff's Title IX claims survive, plaintiff's

demand seeking to recover alleged damages for "mental and physical pain and suffering" should be stricken.

## <u>CONCLUSION</u>

For the reasons set forth above, Ithaca College's motion to dismiss should be granted, and plaintiff's Complaint in all respects should be dismissed.

Dated: June 27, 2025

Hodgson Russ LLP

By:   s/ Thomas S. D'Antonio
        Thomas S. D'Antonio
        Molly F. Plewinski

        1800 Bausch & Lomb Place
        Rochester, New York 14604
        Telephone: (585) 454-0700
        tdantonio@hodgsonruss.com
        mplewinski@hodgsonruss.com

        *Attorneys for defendant Ithaca College*