**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

BRAD HOUGHAM,


                    Plaintiff,


            -v-                                3:25-CV-00529 (AJB/MJK)


TRUSTEES OF ITHACA COLLEGE,


                    Defendant.
_____

**Hon. Anthony Brindisi, U.S. District Judge:**

<u>**DECISION & ORDER**</u>

## I.    INTRODUCTION

Plaintiff Brad Hougham ("Hougham") brings Title IX employment discrimination claims against Defendant Ithaca College Board of Trustees ("College").  Compl., Dkt. No. 1.  The College moves to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Def.'s Mot. to Dismiss, Dkt. No. 9-1.  The Court disagrees with the College that Hougham's claims are precluded by Title VII; however, it agrees that Hougham's deliberate indifference claim fails.  For the following reasons, the College's motion to dismiss will be **GRANTED IN PART and DENIED IN PART**.

## II.    BACKGROUND[1]

Hougham is a tenured professor of music performance at Ithaca College.  Dkt. No. 1 ¶ 6.  In 2019, the provost at the time, La Jerne Terry Cornish ("Dr. Cornish"), appointed Hougham as

---

[1] The following facts are taken from the complaint, Dkt. No. 1, and will be assumed true for the purpose of assessing the motion to dismiss.

an associate provost.  *Id.* ¶ 7.  This newly created role was "an elevated position with high visibility and access to leaders at [Ithaca College]."  *Id.* ¶ 38.  Hougham served in this role for a three-year term, beginning on July 1, 2019, and ending June 30, 2022.  *Id.* ¶ 7.  For the first two years, from July 2019 until August 2021, Hougham served directly under Dr. Cornish.  *Id.* ¶ 15. In that time, Hougham scanned documents, updated the faculty handbook and "various policies," and solicited leadership approval for those changes.  *Id.* ¶ 40.  Between fall 2020 and spring 2021, Hougham also assisted with the College's Academic Program Prioritization ("APP") process, designed eliminate academic programs and faculty positions that were no longer viable due to the College's financial difficulties.  *Id.* ¶ 41.  For his dedication and work, Hougham received praise from then-President Shirley Collado, Dr. Cornish, and the College's board of trustees.  *Id.* ¶ 42.

Shortly after, President Collado resigned, and in July 2021, Dr. Cornish was appointed as the College's interim president.  *Id.* ¶ 43.  As a result of Dr. Cornish's appointment, in August 2021, Melanie Stein ("Dr. Stein"), the Dean of the School of Humanities & Science, was chosen as interim provost.  *Id.* ¶ 16.  Thus, Dr. Stein became Hougham's direct supervisor from then until June 30, 2022.  *Id.* ¶¶ 16, 43.

Although Hougham's term as associate provost was for three years and set to end July 2022, he asserts that it "came with the highly likely prospect for renewal for an additional three years[,]" given his "indisputable merit and accomplishments[.]"  *Id.* ¶ 39.  At least, that was the case until Dr. Stein took over.

Within a month or two, Hougham noticed Dr. Stein had a supervisory approach when it came to him that differed from her approach with the other two associate provosts, both of whom were heterosexual.  *Id.* ¶ 45.  Hougham found that Dr. Stein prioritized tasks assigned to him and

micro-managed those tasks. *Id.* When Hougham explained school policies Dr. Stein didn't "like or comprehend" she "often rais[ed] her voice in anger or frustration." *Id.* Under Dr. Cornish's management, Hougham could work remotely from New York City for a week each month. *Id.* ¶ 46. Dr. Cornish assured Hougham that "this arrangement could continue" after she left. *Id.* However, Dr. Stein told Hougham that, while he might receive her approval for remote work a day or two at a time, she was unlikely to approve week-long blocks. *Id.* Dr. Stein also indicated that Hougham would need permission in advance. *Id.* Neither of the other associate provosts needed to receive advance permission for remote work. *Id.*

Hougham also alleges that, during meetings, Dr. Stein "continually interrupted" him— "often contorting her face and looking around the room to elicit similar reactions from . . . subordinate staff and deans." *Id.* ¶ 49. And at various times Dr. Stein told Hougham that he was "too sensitive," "too thin skinned," "too dramatic," and that if he wanted to do this work, he "need[ed] to be tougher[.]" *Id.* ¶ 50. Hougham contends these appraisals were unrelated to his performance, but simply "code phrases for 'You are too gay[.]'" *Id.*

Once, when Dr. Stein again said he was being too sensitive, Hougham rejoined that, were he heterosexual, she would not have used that phrasing. *Id.* ¶ 51. Dr. Stein became angry and defensive, denied her language was problematic, and stated she had supervised other gay men in the past. *Id.*

At some point in the Fall 2021 semester, a dean's position opened in the College's School of Music, Theatre and Dance. *Id.* ¶ 54. Hougham says he was "nominated" for the role and feels he was highly qualified for it. *Id.* However, Dr. Stein told Hougham "that he could certainly apply[,] but wouldn't be given an interview." *Id.* "Dr. Stein stated that she 'needed someone in that role who was 'stronger' and 'less thin-skinned.'" *Id.*

At a meeting between the two in December 2021, while attempting to relate something Hougham had said before, Dr. Stein began imitating him. *Id.* ¶ 52. This impression, Hougham alleges, involved a raised pitch and exaggerated volume, frantic movements, and Dr. Stein waving her hands around her head with a limp-wrist. *Id.* Believing this impression to be homophobic and sexual harassment, Hougham reported it to President Cornish, the Dean of the School of Humanities and Science, and Kirra Franzese, the Associate Vice President for Human Resources. *Id.* ¶ 57. Yet, when Dr. Stein met with Dr. Cornish to discuss this matter, she "disingenuously" told Cornish that Hougham was "creating 'dysfunction' in the provost's office, impairing its smooth operation." *Id.* ¶ 53.

By the end of 2021, Dr. Stein no longer sought Hougham's counsel or advice. *Id.* ¶ 47. At that point, Hougham concluded that Dr. Stein did not want him on her team—"not for any deficiency in work performance or its timely completion, but . . . because [he was] a gay man." *Id.*

At an undated meeting during the spring or summer of 2022, Dr. Cornish brought up Hougham's "alleged dysfunctional behavior, as related by Dr. Stein." *Id.* ¶ 55. In turn, Hougham "recited the homophobic behaviors he was subjected to by Dr. Stein[.]" *Id.* To these, Dr. Cornish curtly remarked, "[Dr.] Stein will never have been accused of any of these things before." *Id.* Rather than "directly and informally intervening" to curtail Dr. Stein's behavior, Dr. Cornish placed responsibility for ending it solely on Hougham. *Id.* ¶ 56. Dr. Cornish advised Hougham "to use certain language when addressing his perceived sexual discrimination with Dr. Stein." *Id.*

In light of Dr. Cornish's lack of assistance, Hougham contacted Franzese and reported Dr. Stein for continuing sexual harassment. *Id.* ¶ 57. Yet "Franzese stated, nothing could be done."

4

*Id.* ¶ 58.  She acknowledged Hougham was having interpersonal problems with Dr. Stein.  *Id.*
However, Franzese determined there were no actionable violations of the school's policies.  *Id.*
In essence, "she told [Hougham] she wouldn't do anything."  *Id.*

Despite this, "in an apparent attempt to informally resolve [his] claims of sexual
discrimination," Franzese attended one of Hougham and Dr. Stein's weekly meetings.  *Id.* ¶ 59.
There, Hougham related the instances in which he felt Dr. Stein had sexually discriminated
against and bullied him.  *Id.*  In response, at some point, Dr. Stein "announced 'she was so angry
right now[.']"  *Id.*  Their discussion ended without resolution of Hougham's concerns.  *Id.*  And
after the meeting, when the two were alone, Franzese shared with Hougham that "she worried
Dr. Stein was actually angry with her[.]"  *Id.* ¶ 60.

"Shortly after" that meeting, Dr. Stein offered Hougham professional coaching with an
outside consultant.  *Id.* ¶ 61.  Her stated goals for this coaching included "[a]ssuming good
intentions [from] co-workers, resolv[ing] professional disagreements with co-workers . . .
collegial[ly]," and "balanc[ing] adherence to established processes and protocols . . . with
flexibility and compromise where needed[.]"  *Id.*

Hougham found this offer audacious—no goals were included "as to improvement of the
interpersonal relationship between Dr. Stein and [Hougham]," nor was there mention of "any
'coaching' of Dr. Stein[.]"  *Id.*  Because his underlying complaints of sexual harassment
continued to go unaddressed, Hougham rejected the coaching offer "as mere 'window dressing'
and an exercise in futility."  *Id.* ¶ 62.  Following Hougham's rejection, Dr. Stein "advised [him]
that she was not contemplating renewal of his associate provost position for a second, three-year
term."  *Id.* ¶ 63.  Dr. Stein then hired a heterosexual man as his replacement.  *Id.*

Thus, on July 1, 2022, Hougham returned to the teaching faculty, as a part of the newly created School of Music, Theatre and Dance. *Id.* ¶¶ 21, 64. As he was no longer an associate provost, Hougham sustained "a large cut in salary and a black mark on his resume." *Id.* ¶ 64.

To add insult to injury, "after [Hougham's] demotion, [Dr. Stein] reported negatively about him to Ann Hogan, the . . .dean of the School of Music, Theatre and Dance." *Id.* ¶ 66. Still, the alleged harassment did not end there. In fact, Hougham asserts, it continued, if not worsened.

For instance, until Hougham requested it fixed, his name was not shown besides those of students he had recruited in the "faculty contact" column of the school's tracking document. *Id.* ¶ 72. It had, though, appeared if a recruited student chose not to enroll. *Id.* And during the admissions process, Hougham's recommendations on pre-screened candidates were routinely overturned in favor of heterosexual faculty's recommendations. *Id.* ¶ 73. When he sought an explanation from the admissions office, his inquiries were either rebuffed or ignored. *Id.* In faculty meetings, Hougham was constantly interrupted, and he would be "remonstrated if he interjected his opinions on matters under discussion." *Id.* "Additionally, meetings were scheduled in accord with the itineraries of straight colleagues." *Id.* ¶ 74. Consequently, Hougham was often forced to attend virtually to participate. *Id.*

Around this time, the College developed a committee named the Faculty Advisory Group, of which Hougham was one of the original appointees. *Id.* ¶¶ 77, 78. According to Hougham, "it is common on campus for committees to become known by their acronyms." *Id.* ¶ 77. Yet "no one noticed" the problematic nature of this committee's acronym, "F.A.G.," until Hougham pointed it out. *Id.* "[C]ertain committee members and the Dean agreed that the committee should not be referred to by its acronym." *Id.* ¶ 79. However, despite acknowledging that it

should not be used, "various straight members of the committee continued to employ that term." *Id.* "Given this atmosphere, [Hougham] had to continually address the difference between 'offensive' and 'harmful' when the acronym was used." *Id.* ¶ 80.

As they worked to change its name, "Dean Hogan reported to the committee that Dr. Stein . . . requested she continue with the public process required by the new bylaws for changing a committee's name": a motion, discussion, and voting. *Id.* Thus, "[d]uring the discussion phase, [Hougham] was required to explain the need for the change[,] [and] the acronym was repeatedly brought up in [Hougham's] presence." *Id.* ¶ 81. Hougham believes this was intended to offend him. *Id.* Although the committee's name was changed, Hougham found the process humiliating and painful. *Id.*

The Spring 2023 semester was Hougham's first teaching after a three-year hiatus. *Id.* ¶ 68. But his name was not included in that semester's choral concert programs. *Id.* After Hougham pointed this out to Dean Hogan, Dr. Sean Linfors, the interim director of choral activities, contacted him. *Id.* ¶¶ 68, 69. Dr. Linfors stated this omission was "entirely inadvertent," attributing the error to "a 'cut and paste' of an earlier program template." *Id.* ¶ 69. Yet Hougham notes, another faculty member who was also on sabbatical that prior fall did not have her name left off. *Id.* ¶ 70. She was heterosexual. *Id.* Eventually, the archival concert programs were amended. *Id.* ¶ 71. Still, Hougham found this experience painful and demeaning. *Id.*

At some point that spring, during a conversation Dean Hogan made an impromptu request to Hougham asking him to list the homophobic microaggressions he was experiencing. *Id.* ¶ 75. "Having no advance warning that this topic was going to be discussed [Hougham] had to relive very triggering experiences, describing these in detail including criticism of [his] mode

of speech, as being 'gay' because of a perceived lisp." *Id.*  As Hougham recounted each example, Dean Hogan retorted that he was "wrong to perceive homophobia in that conduct or response by others." *Id.*

The following semester, the school's music performance department sought to hire a new tenure-track faculty member. *Id.* ¶ 83.  Hougham served as a member of the search committee. *Id.*  Though there were several internal candidates, none were among the finalists identified by the committee in mid-December 2023. *Id.*  At that time, Dr. Kay served as the search committee's chair. *Id.*  However, Dr. Kay did not continue as chair, taking medical leave for the spring 2024 semester. *Id.* ¶ 84.  Dean Hogan asked Hougham to head the committee, which he accepted. *Id.*  During Dr. Kay's leave, Dr. Martin was appointed interim chair of the Department of Music Performance. *Id.*  When Dr. Martin learned that no internal candidates were finalists, she, without Hougham's prior knowledge, contacted Dean Hogan. *Id.* ¶ 85.  Dr. Martin told Dean Hogan that Hougham had problems with certain internal candidates. *Id.*  She felt this was evidenced by Hougham's reporting those individuals to human resources for alleged policy violations and to the Title IX office for accusations of sexual harassment. *Id.*  Subsequently, Dean Hogan and Dr. Martin asked Hougham to justify the finalists. *Id.* ¶ 87.  Specifically, they inquired why the internal candidates were not finalists. *Id.*  "Put more succinctly," Hougham says, "the gay member of the search committee, not the [two] straight members from [Dr. Martin's] department, was the one called upon to justify the finalist list[.]" *Id.*  Hougham told the two that the finalists had been chosen in December 2023, when Dr. Kay chaired the search committee. *Id.* ¶ 86.  He also noted that two of the three search committee members had previously recommended the finalists to Dean Hogan and Dr. Stein. *Id.*  And that the list of finalists had been approved by Dean Hogan and Dr. Stein. *Id.* ¶ 87.

Perturbed, Hougham asked Dr. Martin why she made accusations against him. *Id.* ¶ 88. She did not answer. *Id.* Hougham answered for her: "he was being targeted as a member of a marginalized group." *Id.* ¶ 89. She responded that she, as an evangelical Christian and Republican living in Ithaca, New York, she was also marginalized. *Id.* Hougham "reiterate[d] that being a member of a political minority in the college community and being a member of a systematically marginalized and protected group were two entirely distinct matters." *Id.* "Nevertheless, Dr. Martin didn't agree, and neither Dean Hogan nor Associate Dean Lubriel supported [Hougham's] position." *Id.*

Hougham also alleges that, at the beginning of the Spring 2024 semester, Dean Hogan coerced him into teaching a course for which he had no prior notice, experience, or time to prepare. *Id.* ¶ 92. In "requesting" that Hougham teach the course, Dean Hogan told him that he would be "alleviat[ing] some of the ill-will exhibited against him by certain faculty in the school, arising from his alleged actions while sitting as replacement chair of the [] search committee." *Id.* ¶ 93. "Important in this vein," Hougham says, "is the irrefutable fact that no [] straight faculty member was coerced into teaching a course for which [they] had no prior curriculum experience, let alone on a single day's notice." *Id.* ¶ 94.

Towards the end of the spring, in May 2024, Hougham emailed Franzese regarding the allegedly discriminatory events he experienced since returning to the teaching faculty. *Id.* ¶ 95. But she did not respond to Hougham for twelve days. *Id.* "Franzese did not undertake any action on [his] behalf." *Id.* ¶ 96. Channeling his frustration, Hougham wrote the following as part of his 2024 self-evaluation:

> [I] am having a hard time surviving the toxic hetero-normative and anti-gay atmosphere at Ithaca College and in my school. I am the only person in meetings that anyone interrupts without apology. I have my words either ignored or needing reaffirmation from a white straight before they are considered. I am constantly

> asked to explain why I 'feel' that this environment of predominantly progressive straight white folks is homophobic, which requires me to relive painful interactions with colleagues and allows the straight white folks to play judge about whether something is homophobic or not.  I show up and I work very hard, and I make difficult decisions based on evidence.  I fall under a different lens of scrutiny than my straight colleagues.  In other instances, during committee meetings with lots of lively discussion and overlapping commentary, I am scolded by faculty members for interrupting.  'You didn't let me finish!' and similar (in raised voice, meant to shame me).  No one else is scolded.  Just me, the gay man in these conversations.  I could recount endless other instances of this, but I won't.  I have to accept that Ithaca College will not follow up with this.  Still, I show up with a positive attitude and a smile on my face . . . I am an excellent teacher.  I want to continue to grow and develop my knowledge and pedagogy, and I have been and will continue so to do.  My students appreciate me and my work, even though I am gay . . .

*Id.* ¶ 97.

In response, "the Dean" thanked Hougham for sharing with them that he was "having a hard time surviving the atmosphere at [the College], and that you feel that [the College] will not follow up." *Id.*  The unnamed dean encouraged him to reach out to those he felt could support him "and to consider the resources at [the College] that are available to [him.]" *Id.*

"Following up on the Dean's suggestion," Hougham contacted the Title IX office. *Id.* ¶ 98.  There, he spoke with Linda Koenig, and on April 2, 2024, he sent her "[a] detailed written narrative of [his] harassment[.]" *Id.*  Koenig told Hougham "that[,] while she could take action, it wouldn't result in anything significant because of the individuals involved." *Id.*  "Instead, Koening suggested a non-Title IX avenue to pursue[.]" *Id.* ¶ 99.  However, Hougham deemed that avenue "unavailable because of the expiration of the applicable statute of limitations." *Id.*

Then, in March 2025, Hougham found several recorded auditions of prospective applicants to the school that had not been processed. *Id.* ¶ 100.  Some had been evaluated only by one faculty member. *Id.*  Others had not been evaluated by any faculty member. *Id.*  Hougham proposed that he evaluate the unreviewed auditions. *Id.* ¶ 101.  "In response to [Hougham's] offer of assistance, the Associate Dean replied that every audition required a

second faculty evaluator. *Id.* ¶ 102. Hougham continued evaluating the auditions with another faculty member, which [Hougham] accepted." *Id.* But Hougham learned later that a heterosexual colleague of his, one with fewer years of teaching and faculty experience, had been permitted to be the sole evaluator on several auditions. *Id.* ¶ 103. "In other words," Hougham says, the College "required the second opinion of a straight colleague for an application . . . to be processed by [him], but this same requirement was not imposed on his heterosexual colleagues." *Id.* ¶ 105. In his next annual self-evaluation, Hougham again made his voice heard:

> [I]'m an outstanding faculty member. I believe that my teaching is head and shoulders above the standard of excellence that is expected of others in our school. As a member of the LGBTQIA + community, I continue to have to deliver at a level that far exceeds expectations in order to be valued, and it is exhausting . . . I hope to manage the discrimination I face daily from the college so that I can continue to do my job. As a result of this toxic environment, my mental health continues to challenge me, but I have sought professional support, at great personal financial cost, and I hope to make headway . . . I arrived at further clarity about how I am often treated. When I muster up the courage to mention how I've been mistreated by colleagues, my supervisor might say- 'I'm sorry you feel that way.' This response, of course, suggests that I am imagining my lived experience. Microaggressions and discrimination aren't imagined. They are real. . . . My previous dean encouraged me to reach out to campus resources that are available to me, which I was grateful for. However, those resources are impotent and the college continues to deny that I am suffering. They continue to harm me and allow me to be harmed by others. It is a toxic environment. I am scapegoated in the voice area. My questions raised in my area are often perversely twisted and then weaponized against me, so as to create mistrust among our group . . . I am vilified. I live in a culture where my voice is constantly vilified. I am grateful to Steve (Dean TenEyck) and Luis (Associate Dean Lubriel) for their support and help[.]

*Id.* ¶ 106.

## III.    STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim, a complaint must provide enough facts to state a claim to relief that is plausible on its face. *Kumpf v. N.Y. State United Tchrs.*, 642 F. Supp. 3d 294, 304 (N.D.N.Y. 2022) (Scullin, J.) (citing *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013)). "A court must accept as true all

factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor." *Lancaster v. Am. Textile Co., Inc.*, 719 F. Supp. 3d 204, 214 (N.D.N.Y. 2024) (citing *EEOC v. Port Auth. of New York & New Jersey*, 768 F.3d 247, 253 (2d Cir. 2014)).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Smith v. Adidas Am., Inc.*, 691 F. Supp. 3d 564, 572–73 (N.D.N.Y. 2023) (Sannes, C.J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## IV.    DISCUSSION

### A.    Title VII Does Not Preclude Plaintiff's Title IX Claims

The College argues that Title VII precludes the Title IX claims in this case; therefore, Hougham's complaint should be dismissed.  Much of the College's argument centers around the Second Circuit's opinion in *Vengalattore v. Cornell University*, 36 F.4th 87 (2d Cir. 2022). There, a male former tenure-track professor alleged that, in disciplining him in response to a female graduate student aide's allegation of their having an inappropriate sexual relationship, the university discriminated against him based on gender in violation of Title IX.  *See id.* at 94–100.

The College concedes that in *Vengalattore* "the Second Circuit held . . . 'Title IX allows a private right of action for a university's intentional gender-based discrimination against a faculty member[.]'"  Defs. Mot. to Dismiss, Dkt. No. 9-1 at 17 (quoting *Vengalattore*, 36 F.4th at 101). But the College believes *Vengalattore* is distinguishable.  In *Vengalattore*, the circuit panel's "analysis focused on whether the process and outcome of Cornell's Title IX investigation, and the resulting disciplinary proceeding, was infected by bias on the basis of gender."  *Id.* (citing *Vengalattore*, 36 F.4th at 106–09).  The College stresses, though, that the panel "did not directly opine on whether Title VII's applicability to employment discrimination claims bars an employee's private cause of action under Title IX when that Title IX claim seeks relief unrelated

to an allegedly faulty or biased Title IX process." *Id.* The College contends that, had the Second

Circuit "considered the question[,] [its] answer would be in the affirmative." *Id.*

In its consideration, the *Vengalattore* panel found guidance in *Doe v. Mercy Catholic

Medical Center*. *See generally* 850 F.3d 545 (3d Cir. 2017). "In *Mercy*[,] the Third Circuit

reversed the ruling of the district court which had concluded that Title IX could not apply to a

hospital's medical residents[.]" *Vengalattore*, 36 F.4th at 105. The *Mercy* panel rejected an

argument like the College's here. It noted the Fifth and Seventh Circuits' categorical holdings

"that Title VII provides the exclusive remedy for individuals alleging employment discrimination

on the basis of sex in federally funded educational institutions." *Doe v. Mercy Cath. Med. Ctr.*,

850 F.3d 545, 563 (3d Cir. 2017) (citing *Lakoski v. James*, 66 F.3d 751, 753 (5th Cir. 1995) and

*Waid v. Merrill Area Pub. Schs.*, 91 F.3d 857, 861–62 (7th Cir. 1996)). Nevertheless, it openly

"question[ed] the continued viability of *Lakoski* and *Waid*[.]" *See Doe*, 850 F.3d at 563. Instead,

the Third Circuit held that "a private retaliation claim [and] a private quid pro quo claim exist[]

for employees of federally-funded education programs under Title IX notwithstanding Title VII's

concurrent applicability." *Doe*, 850 F.3d at 563–64.

Ultimately, the *Vengalattore* panel "agree[d] with *Mercy*" that it "must honor the breadth

of Title IX's language." 36 F.4th at 106. The Second Circuit panel "thus h[eld] that Title IX

allows a private right of action for a university's intentional gender-based discrimination against

a faculty member, and that [the] Title IX claim should not have been dismissed on the ground

that [the plaintiff] complained of such discrimination with respect to employment." *Id.* Given

this context and the opinion's expansive language, the Court does not read *Vengalattore* as

supporting the limitation that the College now wishes for it to impose. Accordingly, the Court

will not dismiss the complaint on the basis that Hougham's Title IX claims are precluded by Title VII.

Still, the Court acknowledges that the Third Circuit in *Mercy* did not decide whether Title VII's applicability rendered a Title IX claim for hostile environment inviable. *See Doe*, 850 F.3d at 566; *see also id.* ("It's an open question in [the Third Circuit] whether [the] [continuing violations] doctrine applies under Title IX.") (listing cases). As the College highlights, the Eleventh Circuit recently joined the Fifth and Seventh Circuits' categorical approach. *See* Dkt. No. 9-1 at 18; Dkt. No. 12 at 9 (citing *Joseph v. Bd. of Regents of the Univ. Sys. of Georgia*, 121 F.4th 855, 869 (11th Cir. 2024)); *Joseph*, 121 F.4th at 869 ("It is unlikely that Congress intended Title VII's express private right of action and Title IX's implied right of action to provide overlapping remedies."); *Joseph*, 121 F.4th at 869 (holding Title IX does not create an implied right of action for sex discrimination in employment); *but see Joseph v. Bd. of Regents of the Univ. Sys. of Georgia*, 133 F.4th 1284, 1288 (11th Cir. 2025) (Rosenbaum, J., dissenting from denial of rehearing en banc) ("[T]oday we shirk our obligation. It's telling that in the [last] two decades[,] every one of our sister circuits that has considered whether a teacher may sue under Title IX has found they may—the opposite conclusion of our Court.") (citing *Vengalattore* and collecting cases). The Court is also aware that this is a developing area of law. *Cf.* Invitation for Solicitor General to file brief expressing views of the United States, *Crowther v. Board of Regents*, 25-183 (U.S. Dec. 8, 2025).[2] Should it be warranted, the College may reassert their arguments at a later stage of this case.

---

[2] The Eleventh Circuit's *Joseph* opinion consolidated the appeals of *Crowther v. Bd. of Regents of Univ. Sys. of Georgia*, 2023 WL 4915078 (N.D. Ga. May 12, 2023) and *Joseph v. Bd. of Regents of Univ. Sys. of Georgia*, 2023 WL 2393974 (N.D. Ga. Mar. 3, 2023). As of August 2025, the plaintiffs' writ of certiorari remains pending before the United States Supreme Court.

**B.**    **Plaintiff's Claims**

Hougham alleges "a sole count" against the College.  Dkt. No. 1 at 32.  That "sole" count is divided into three "branches": "Sexual Harassment/Hostile Educational Environment" ¶¶ 114–19, "Deliberate Indifference" (¶¶ 120–22), and "Retaliation" (¶¶ 123–28).  These "branches" appear to be three claims.  *See* Pl.'s Resp., Dkt. No. 11 at 10–11 ("[C]ontrary to defendant's legal position . . . court decisions in the [S]econd [C]ircuit support plaintiff's contention that Title IX's broad reach . . . permits his separate claims of: a hostile educational environment in which plaintiff was sexually harassed by one of the most senior members of Ithaca College's administration (Provost Stein), along with other faculty members; deliberate indifference exhibited by senior administration and designated Title IX officials to plaintiff's multiple complaints of the sexual harassment; and retaliation in response to plaintiff's protected activity of reporting the sexual harassment he was experiencing, in conformity with defendant's policies and Title IX regulations.").

The Court will consider the three claims in turn.

**1.**    **Hostile Educational Environment**

Hougham brings a claim for "hostile educational environment" against the College.  *See* Dkt. No. 1 ¶¶ 114–19.  "A private action for damages against an educational institution is only available under Title IX 'where the funding recipient [in this case, the University] engages in intentional conduct that violates the clear terms of the statute.'"  *Doe v. Yeshiva Univ.*, 703 F. Supp. 3d 473, 490 (S.D.N.Y. 2023) (quoting *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999)).  "In [Title IX] cases of . . . sexual harassment, an action for damages against an institution is not premised 'on principles of respondeat superior or constructive notice.'"  *Id.* (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285

(1998)).  Therefore, the College "may only be held 'directly liable' for its own 'deliberate indifference to discrimination' and 'its own failure to act.'" *Id.* quoting (*Davis*, 526 U.S. at 645–46).

Moreover, "a Title IX hostile education environment claim is 'governed by traditional Title VII 'hostile environment' jurisprudence.'"  *Doe v. Sarah Lawrence Coll.*, 453 F. Supp. 3d 653, 666 (S.D.N.Y. 2020) (quoting *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011)).  "Making a 'hostility' determination in the educational context, as in the employment context, entails examining the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with' the victim's academic performance." *Doe v. Sarah Lawrence Coll.*, 453 F. Supp. 3d 653, 666 (S.D.N.Y. 2020) (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003)).

"The Second Circuit has 'cautioned against setting the bar too high' for hostile . . . environment claims." *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 335 (S.D.N.Y. 2020) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)); *see Sanderson v. Leg Apparel LLC*, 2020 WL 3100256, at *8 (S.D.N.Y. June 11, 2020) ("[T]o avoid dismissal under FRCP 12(b)(6), a plaintiff need only plead facts sufficient to support the conclusion that she was faced with harassment of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse, and [the Second Circuit has] repeatedly cautioned against setting the bar too high in this context.") (quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)).

Construing the complaint liberally, and mindful of the Second Circuit's admonition, the Court finds that Hougham's allegations are adequate to plead a hostile environment claim.

Reading the facts in the light most favorable to plaintiff, Hougham alleges that he was repeatedly refused advancement opportunities and was subjected to disproportionate workloads, mimicry, slurs, and higher performance standards because of his sexuality—in addition to "other unfair treatment that, while facially neutral and not actionable as a disparate-treatment claim per se, supplements [his] allegations[.]" *Byvalets v. New York City Hous. Auth.*, 2017 WL 7793638, at *14 (E.D.N.Y. July 28, 2017), *report and recommendation adopted,* 2018 WL 1067732 (E.D.N.Y. Feb. 23, 2018); *see Rys v. Davis*, 2025 WL 896844, at *9 (S.D.N.Y. Mar. 24, 2025) ("Allegations of a heavier workload alone can support a viable hostile work environment claim if the plaintiff was subjected to disproportionately burdensome work assignments.") (quoting *Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 466 (S.D.N.Y. 2023)); *Cardwell v. Davis Polk & Wardwell LLP*, 2020 WL 6274826, at *28 (S.D.N.Y. Oct. 24, 2020) ("The same logic applies to allegations that a plaintiff received less work than similarly situated coworkers, at least when, as here, the plaintiff alleges that his career prospects suffered because he received less work.").

At the pleading stage, this is sufficient to state a hostile work environment claim. "That plaintiff has raised only a minimal inference of discriminatory motive and may have difficulty making the requisite showing on the merits . . . are arguments for summary judgment, not dismissal." *Byvalets*, 2017 WL 7793638, at *14.

## 2.    Deliberate Indifference

Hougham also brings a cause of action for "deliberate indifference." *See* Dkt. No. 1 ¶¶ 120–22. For this claim to withstand dismissal, Hougham asserts that he "must plausibly allege . . . (a) sexual harassment so severe, pervasive and objectively offensive that it deprived him of access to the [College's] educational benefits and opportunities; (b) [the College] had actual

knowledge of the sexual harassment; and (c) [the College] was deliberately indifferent to this harassment." Dkt. No. 11 at 18–19 (citing *Doe v. Union Coll.*, 2020 WL 1063063, at *3 (N.D.N.Y. Mar. 5, 2020)). Yet Hougham's hostile environment claim also alleges sexual harassment "so severe, pervasive and objectively offensive . . . that it denied [him] equal educational access and opportunities" at the College. Dkt. No. 11 at 16. Moreover, as noted above, "[a] finding of deliberate indifference is necessary to impute liability against an institution under Title IX." *Doe v. Salisbury Univ.*, 107 F. Supp. 3d 481, 489 (D. Md. 2015).

Because deliberate indifference is a necessary element of plaintiff's hostile environment claim, and the two claims are otherwise identical, plaintiff's deliberate indifference claim is dismissed as duplicative. *See, e.g.*, *Daly by & through Daly v. Miller Place Union Free Sch. Dist.*, 2025 WL 3470167, at *8 (E.D.N.Y. Dec. 3, 2025) (collecting cases).

**3.     Retaliation**

Lastly, Hougham asserts that the College, "through the actions of Dr. Stein, retaliated against [him] after he . . . report[ed] Dr. Stein's sexual harassment to Dr. Cornish and Ms. Franzese." Dkt. No. 1 ¶ 123. That retaliation "consisted of [Dr. Stein's] unjustified refusal to renew plaintiff as Associate Provost" and her "blocking [his] candidacy for appointment as a dean within the School of Music, Theatre and Dance, by her refusal to allow [him] an interview for that position." *Id.* ¶¶ 124, 125.

Hougham filed this suit on April 30, 2025. *See* Dkt. No. 1. Both Hougham and the College "agree on one thing[—]the statute of limitations for [his] claims is three (3) years and is reckoned from the filing of [the] complaint[.]" Dkt. No. 11 at 20–21; *see* Dkt. No. 9-1 at 19; *see also Hauff v. State Univ. of New York*, 425 F. Supp. 3d 116, 134 (E.D.N.Y. 2019) ("Claims brought pursuant to Title IX are subject to a three-year statute of limitations."). "Thus, acts or

omissions occurring prior to April 30, 2022, are nonactionable." Dkt. No. 9-1 at 19; *see also* Dkt. No. 11 ("[I]n the absence of other considerations, liability based on claimed wrongful actions by defendants antedating April 24 [sic] 2022, might technically be unenforceable.").

The College argues that "at a minimum" Dr. Stein's alleged blocking of Hougham's candidacy for appointment as a dean within the School of Music, Theatre and Dance "fall[s] outside the applicable limitations period, and therefore [is] not actionable." Dkt. No. 9-1 at 19–20 (citing Dkt. No. 1 ¶¶ 54, 125).

Without doubt, the complaint's timeline is poorly presented. In lieu of giving specific dates, or even—at points—specific months in which certain key events occurred, the complaint offers vague subheadings covering arbitrary date ranges. *See, e.g.*, Dkt. No. 1 at 16 (5-month period of "August 2021 – December 2021"); *id.* at 20 (7-month period of "January 2022 – July 2022"); *id.* at 22 (11-month period of "August 2022 – June 2023"); *id.* at 28 (15-month period of "January 2024 – March 2025"). Presumptively, these headers are intended to suggest that the events in the paragraphs that follow occurred sometime within those spans.

Both discrete acts that Hougham's retaliation claim is founded upon are left undated in his complaint. *See* Dkt. No. 1 ¶ 54 ("When a dean's position opened in the School of Music Theatre and Dance, for which plaintiff was highly qualified and nominated for, Dr. Stein told plaintiff that he could certainly apply for that position but wouldn't be given an interview. Dr. Stein stated that she 'needed someone in that role who was 'stronger' and 'less thin-skinned'.'"); *id.* ¶ 63 ("Following plaintiff's rejection of Dr. Stein's offer of professional coaching, she advised plaintiff that she was not contemplating a renewal of his associate provost position for a second, three-year term."); *see also id.* ¶¶ 61–62 (providing no hint of when the coaching offer was made).

Construing the complaint according to its own internal logic, Hougham's allegation regarding Dr. Stein's blocking his candidacy for a dean position would appear to have occurred outside the statute of limitations.  The paragraph of the complaint making that allegation, paragraph 54, is contained under the subheading "August 2021 – December 2021."  *See id.* at ¶¶ 44–54; *see id.* at 19 (placing the subheading "January 2022 – July 2022" after paragraph 54 but before paragraph 55); *see also id.* at 36 (citing solely paragraphs from subsections contained entirely outside the statute of limitations in support of retaliation claim); Dkt. No. 11 at 20 (same).  Similarly, when exactly it was that Dr. Stein notified Hougham about the associate provost position nonrenewal is unclear: this allegation is made under the complaint's subheading "January 2022 – July 2022."  *See id.* at 19–22.  Given that the statute of limitations excludes discrete retaliatory actions occurring prior to April 30, 2022, the Court does not highlight this imprecision for the sake of mere pedantry.

Still, although perhaps inadvisable, Hougham's tendency to brush with such broad strokes is not—at this stage—fatal.  "[T]he statute of limitations is an affirmative defense, and the defendant bears the burden of proving it applies."  *Myers Indus., Inc. v. Schoeller Arca Sys., Inc.*, 171 F. Supp. 3d 107, 115 (S.D.N.Y. 2016) (citing Fed. R. Civ. P. 8(c)).  "[S]urvival of a Rule 12(b)(6) motion to dismiss on statute of limitations grounds requires only allegations consistent with a claim that would not be time-barred."  *Medcenter Holdings Inc. v. WebMD Health Corp.*, 2021 WL 1178129, at *5 (S.D.N.Y. Mar. 29, 2021) (quoting *Harris v. City of N.Y.*, 186 F.3d 243, 251 (2d Cir. 1999)).  "The rule 'in the statute of limitations context is that dismissal is appropriate only if a complaint *clearly* shows the claim is out of time.'"  *Id.* (quoting *Harris*, 186 F.3d at 250) (emphasis added).

It may well be that these discrete incidents predate April 30, 2022, and are time-barred with respect to Hougham's claim of retaliation.  But at this stage, despite the College's assertion otherwise, that is not clear.  Therefore, Hougham's retaliation claim may proceed.

## V.      CONCLUSION

For the reasons set forth above, it is

**ORDERED** that

1.  Defendants' motion (Dkt. No. 9) is **GRANTED IN PART and DENIED IN PART**.

    a.   Plaintiff's Title IX deliberate indifference claim is **DISMISSED**.

    b.   Plaintiff's Title IX hostile environment and retaliation claims remain.

**SO ORDERED.**

Dated: February 27, 2026

       Utica, New York

Anthony J. Brindisi
U.S. District Judge